UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 13-4**

ELRICO DARNELL FOWLER,

        Petitioner – Appellant,

    v.

CARLTON B. JOYNER, Warden, Central Prison, Raleigh, North
Carolina,

        Respondent – Appellee.

Appeal from the United States District Court for the Western
District of North Carolina, at Charlotte.  Frank D. Whitney,
District Judge.  (3:09-cv-00051-FDW)

Argued:  April 11, 2014        Decided:  June 2, 2014

Before TRAXLER, Chief Judge, DUNCAN, Circuit Judge, and DAVIS,
Senior Circuit Judge.

Judgment affirmed and motion denied by published opinion.  Chief
Judge Traxler wrote the opinion, in which Judge Duncan joined.
Senior Judge Davis wrote an opinion concurring in the judgment
in part and dissenting in part.

**ARGUED**: Mark Jason Pickett, CENTER FOR DEATH PENALTY LITIGATION,
Durham, North Carolina, for Appellant.  Sonya M. Calloway-
Durham, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North
Carolina, for Appellee.  **ON BRIEF**: Shelagh Rebecca Kenney,
CENTER FOR DEATH PENALTY LITIGATION, Durham, North Carolina, for
Appellant.  Roy Cooper, Attorney General, NORTH CAROLINA
DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee.

TRAXLER, Chief Judge:

Petitioner Elrico Darnell Fowler, a North Carolina death row inmate, appeals the district court's denial of his petition for a writ of habeas corpus under 28 U.S.C. § 2254. We granted a certificate of appealability to consider Fowler's claim that an eyewitness's in-court identification violated his due process rights under the Fourteenth Amendment. Because the North Carolina state court's rejection of Fowler's claim was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court, we affirm the district court's denial of Fowler's petition for habeas relief.

While this appeal was pending, Fowler filed a motion requesting that we designate his current, appointed counsel to be "Martinez counsel," referencing the Supreme Court decision in Martinez v. Ryan, 132 S. Ct. 1309 (2012), and our decision applying it in Juniper v. Davis, 737 F.3d 288 (4th Cir. 2013), and remand the matter to the district court for further investigation and amendments, if appropriate, to his § 2254 petition. Because Fowler had the benefit of the qualified, independent counsel called for in Juniper and he failed to raise any Martinez-based claims below, we deny the motion as well.

I.

A.

Fowler was convicted in North Carolina state court of the first-degree murder of Bobby Richmond, assault with a deadly weapon with intent to kill Bharat Shah, and two counts of robbery with a dangerous weapon. All of the convictions arise out of an armed robbery that occurred at a Howard Johnson's Motel in Charlotte, North Carolina, on December 31, 1995. The circumstances surrounding the crime, as summarized by the North Carolina Supreme Court, are as follows:

On 31 December 1995 at approximately 10:45 p.m., Bobby Richmond (Richmond), an employee at a Howard Johnson's Motel in Charlotte, North Carolina, entered the motel lobby looking for ice. Bharat Shah (Shah) was working as the motel night clerk. About five minutes later, two black males entered the motel and approached the check-in counter. One of the men pulled out a gun and ordered Richmond to get on the ground. The other man ordered Shah to "open the register and give [him] the money." While Shah was handing over the money, the man with the gun shot both Richmond and Shah. He then ordered Shah to open the office safe. When Shah stated he did not have the combination, the man shot Shah again. Both assailants then fled the motel.

The Charlotte–Mecklenburg Police arrived at the scene at 11:04 p.m. and found Richmond and Shah lying near the counter. Richmond was unresponsive. Shah was struggling to speak with police. He told the police they had been robbed by two black males, one wearing a green jacket.

When paramedics arrived, they found a large wound in the middle of Richmond's back. Richmond had no carotid pulse. The paramedics determined Shah's life was in danger. A hospital surgeon later found two

3

wounds in Shah's left thigh, two more wounds in Shah's back, and a wound in Shah's right forearm.

A high-velocity weapon caused Shah's thigh injury. Doctors removed two .44-caliber bullet jacket fragments from his forearm during surgery. A .44-caliber bullet jacket was also found in Richmond's left lung. Police located a .44-caliber bullet core in the motel carpet beneath Richmond's chest wound. Police also found a .44-caliber bullet jacket and a large fragment from a .44-caliber bullet jacket at the scene. Both had been fired from the same weapon used to shoot Richmond. Other pieces of metal found at the scene were also consistent with .44-caliber ammunition.

Richmond had an entrance wound in his back and an exit wound in his chest. His chest was against a hard surface when he was shot. The evidence showed Richmond was likely shot from a distance of no more than three feet.

Officers found Richmond's wallet at the scene next to his body. The wallet contained no money. The cash register drawer and a plastic change drawer next to the register also contained no money. Approximately $300.00 was stolen from the motel during the robbery.

State v. Fowler, 548 S.E.2d 684, 689-90 (N.C. 2001).

At trial, Jimmy Guzman, the owner of the restaurant adjoining the motel lobby, testified that he heard gunshots around 11:00 p.m. in the lobby of the motel. He looked through the glass door of the restaurant and saw one of the robbers standing behind the check-in counter. Guzman observed the man for approximately five seconds before running to call the police. According to Guzman, "the man was black, in his late twenties, and approximately six feet tall." Id. at 690. He "had a pointed nose and hair on his face but not a full beard"

4

and "was wearing a green toboggan and a camouflage army jacket." Id.[1] Over Fowler's objection, Guzman identified Fowler in court as the man he saw behind the counter that night.

In addition to Guzman's in—court identification of Fowler, the prosecution presented the testimony of several witnesses to whom Fowler had made incriminating statements. Jermale Jones testified that Fowler told him on Thanksgiving 1995 that he planned to rob a Howard Johnson's motel. In March 1996, Fowler additionally admitted to Jones "that he entered the Howard Johnson's with a handgun to attempt a robbery and that when the people working at the motel made him ask twice for the money, [he] shot them [with] 'a big old .44.'" Id. at 691. Leo McIntyre testified that he went to the Sugar Shack, a local nightclub, on December 31, 1995, and spoke with Fowler. Fowler, who was dressed in army fatigues, told McIntyre "that he shot two people during a robbery at a Howard Johnson's" motel. Id. Later in the week, Fowler also told McIntyre "that, although he thought he had killed both people at the robbery, one of them

---

[1] Bharat Shah survived the shooting and also described the events to the investigating officers. However, Shah told the officers "that he did not get a good look at the shooter because he was primarily focused on the man taking the money" and that "he probably could not recognize the suspects." State v. Fowler, 548 S.E.2d 684, 691 (N.C. 2001). Shah moved to India after he recovered from his wounds and, despite assurances that he would be given police protection, refused to return for the trial. See id.

had lived." Id. Fowler also told McIntyre "that he only got two or three hundred dollars" from the robbery. Id. Waymon Fleming was living with Fowler at the time of the robbery. He testified that Fowler admitted robbing the motel and shooting the "people who would not open the safe." Id. When Fowler told Fleming that he was going to flee the state, Fleming notified the authorities and Fowler was apprehended.

In addition to the above evidence, Edward Adams testified that he was with Fowler at an apartment on the night of the robbery. He testified that Fowler left the apartment "between 9:00 and 10:00 p.m. with two other men and returned between midnight and 1:00 a.m." Id. Fowler then left to go to the Sugar Shack. Adams testified that he purchased a .44-caliber revolver from Fowler the following evening. Later, in April 1996, Fowler "asked Adams where the gun was located, and Adams told him the gun had been destroyed. [Fowler] responded, 'I'm glad,' and asked Adams not to tell people about the gun." Id. Fowler also told Adams that the prosecutor did not know who purchased the gun. See id. Shenitra Johnson told officers that Fowler arrived at her home shortly after 11:30 p.m. on December 31, 1995, and left between 12:30 and 1:00 a.m., and that Fowler had a .44-caliber gun, which he later sold. At trial, however, Johnson testified that Fowler was at her home from 10:30 p.m. on December 31, 1995, until 1:15 or 1:30 a.m. the next morning, and

6

denied seeing Fowler sell or attempt to sell a handgun at her apartment. See id. at 692.

## B.

In November 1997, Fowler was convicted by the jury of all charges. He was thereafter sentenced to death. On appeal to the North Carolina Supreme Court, Fowler argued that his convictions should be overturned because Guzman's in-court identification deprived him of his right to due process. The North Carolina Supreme Court affirmed, see id. at 704, and the United States Supreme Court denied certiorari, see Fowler v. North Carolina, 535 U.S. 939 (2002). Fowler's motion for state postconviction relief, which added a related claim that Fowler's trial counsel was constitutionally ineffective in the handling of Guzman's identification, was also denied, see State v. Fowler, 668 S.E.2d 343 (N.C. 2008), and the United States Supreme Court again denied certiorari, see Fowler v. North Carolina, 129 S. Ct. 2392 (2009).

Fowler thereafter filed this petition for federal habeas relief pursuant to 28 U.S.C. § 2254, raising sixteen separate claims. The district court denied the petition and declined to issue a certificate of appealability. At Fowler's request, we granted a certificate of appealability to consider Fowler's claim that the state court's adjudication of his in-court

7

identification claim was contrary to, or an unreasonable application of, Supreme Court precedent.[2] We now affirm.

## II.

### A.

We begin with the clearly established constitutional principles applicable to in-court eyewitness identifications. The United States Supreme Court has set forth a two-part approach to determine whether an eyewitness identification must be suppressed because it has been tainted by police procedures or conduct. See Perry v. New Hampshire, 132 S. Ct. 716, 724 (2012). First, the court considers whether the identification procedure employed by the police was "both suggestive and unnecessary." Id. Second, the court must "assess, on a case-by-case basis, whether improper police conduct created a substantial likelihood of misidentification." Id. (internal quotation marks omitted). That is, the court must determine "whether under the totality of the circumstances the identification was reliable even though the confrontation procedure was suggestive." Neil v. Biggers, 409 U.S. 188, 199 (1972) (internal quotation marks omitted).

----

[2] In his federal habeas petition, Fowler also reasserted his claim that his trial counsel was constitutionally ineffective in the handling of his in-court identification claim. Fowler did not seek a certificate of appealability on this issue.

8

When considering the question of whether the identification was reliable under the second prong, the Supreme Court has also identified five factors for consideration. They include: (1) "the opportunity of the witness to view the criminal at the time of the crime"; (2) "the witness' degree of attention"; (3) "the accuracy of the witness' prior description of the criminal"; (4) "the level of certainty demonstrated by the witness at the confrontation"; and (5) "the length of time between the crime and the confrontation." Biggers, 409 U.S. at 199-200. These factors are weighed against "the corrupting effect of the suggestive identification itself." Manson v. Brathwaite, 432 U.S. 98, 114 (1977).

Thus, "[e]ven when the police use such a procedure . . ., suppression of the resulting identification is not the inevitable consequence." Perry, 132 S. Ct. at 724. The eyewitness identification need be suppressed only if the procedures used to obtain the identification were "'so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law.'" Biggers, 409 U.S. at 196 (quoting Stovall v. Denno, 388 U.S. 293, 302 (1967).

Moreover, the exclusion of such evidence is the exception to the rule that favors the admissibility of eyewitness identification for the jury's consideration. Ordinarily, "[t]he

9

Constitution . . . protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting introduction of the evidence, but by affording the defendant means to persuade the jury that the evidence should be discounted as unworthy of credit." Perry, 132 S. Ct. at 723; see also Harker v. Maryland, 800 F.2d 437, 443 (4th Cir. 1986) (noting that the exclusion of identification evidence is "a drastic sanction . . . that is limited to identification testimony which is manifestly suspect"). In the absence of "a very substantial likelihood of irreparable misidentification, . . . such evidence is for the jury to weigh." Brathwaite, 432 U.S. at 116 (internal quotation marks omitted). Courts should be "content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." Id.

B.

Prior to trial, Fowler moved to suppress Guzman's expected in-court identification of him from the Howard Johnson's motel, asserting that any such identification by Guzman would be the product of impermissibly suggestive, photographic arrays

10

presented to Guzman in the immediate aftermath of the robbery and murder.[3]

The first photographic array occurred on January 8, 1996. Guzman was presented with a six-person photographic array that included a photograph of Fowler that had been taken in November 1995. In the photograph, Fowler had a full head of hair, a full beard, and a mustache. As noted above, however, Guzman's initial description of the robber was of a man with a toboggan cap, some hair on his face, but not a full beard. Guzman declined to identify any of the photographs as resembling the man he saw in the motel lobby.[4]

On January 14, 1996, police officers presented Guzman with another six-person photographic array that included Fowler and five additional photographs that had been selected as similar by a computer program. This array, however, contained an arrest photograph of Fowler that had been taken just two days earlier, on January 12, 1996. In this photograph, Fowler had a shaved head and light facial-hair stubble. Although Guzman would not positively identify any of the photographs as being of the man

---

[3] Although Fowler initially moved to suppress both the pre-trial photographic arrays and the in-court identification, he later withdrew the motion to suppress the arrays.

[4] On January 11, 1996, the police released the November 1995 photograph of Fowler to the media. However, Guzman testified that he did not see the media coverage.

11

he saw on the night of the robbery, he selected Fowler's photograph as the one that "most closely resembled" the man. J.A. 138.

On April 3, 1996, the police presented Guzman with another photographic array, which contained the photograph of a man whom police believed to be an accomplice of Fowler in an earlier crime but which did not include a photograph of Fowler. At the time, police had not yet identified the second robber and the purpose of this array was to see if Guzman recognized the suspected accomplice. Again, Guzman would not positively identify any of the men, but he chose two photographs that he said most closely resembled the man he saw that night.[5]

Just prior to the evidentiary hearing on Fowler's motion to suppress, the prosecutor met with Guzman, who had been subpoenaed to testify. During the meeting, Guzman was told that Fowler would be seated between his attorneys at the defense table during the hearing. At the hearing, Guzman confidently identified Fowler -- who was dressed in an orange, jail jumpsuit and seated between defense counsel -- as the man Guzman observed

---

[5] Although not raised in connection with his motion to suppress before the trial court, there was evidence presented at the state MAR proceeding that Guzman was presented with two additional arrays early on in the investigation that also did not include Fowler. In one, Guzman declined to identify anyone. In the other, he selected a photograph of Cullen Marshall, who would later become Fowler's co-defendant, as resembling one of the robbers.

in the motel lobby.  Guzman testified that his identification was based on his having seen Fowler on the night of the robbery and not on his having seen any photograph of Fowler in the interim.  Moreover, when Guzman was presented with the January 12, 1996, array at the suppression hearing, he was unable to identify the photograph that he had earlier selected as the one that most closely resembled the man he saw that night.

At the conclusion of the hearing on the motion to suppress, the trial court made detailed findings of fact regarding Fowler's challenge to Guzman's identification.  Of particular note, the trial court found as follows:

> Mr. Guzman was approximately 25 feet from the person he observed behind the counter at the time of his observations.  The lobby was lighted with fluorescent lighting, and all the lights in the lobby appeared to be turned on.  He was able to observe the individual from the level of the counter up, which allowed him to observe the other part of the body of that person, including his face and facial features.  Mr. Guzman was able to look at the face of the person for approximately five seconds and see the face from different angles. . . .  The individual was not wearing a mask or anything covering his face.  He was wearing a toboggan on his head.  Mr. Guzman does not wear prescription eyeglasses nor is there any indication that he is in need of corrective lenses.  During the time that he observed the individual behind the counter, there was no obstruction of his view of the person's face, there was no distraction of his attention from the individual, and he was able to focus his attention on the person.

J.A. 191-92.  The trial court also addressed Fowler's claim that the prosecutor's pre-hearing statement to Guzman about Fowler's

13

expected location in the courtroom compounded the impermissibly suggestive procedure:

> Prior to his testimony in Court, Mr. Guzman met with the prosecutors concerning his testimony and was informed that the Defendant would be present in Court and would be seated between his attorneys at the defense counsel table. Mr. Guzman indicated his identification of the Defendant in open Court [was] based upon his recollection [of] the appearance on the Defendant as being the person behind the counter at Howard Johnson's Motel on December 31st, 1995 and not based upon any suggestion or inference in conferences with the police officers or with prosecuting attorneys. Mr. Guzman also indicated that he was confident that the Defendant was the person he had seen in Howard Johnson's on December 31st, 1995.

J.A. 192-93. The trial court concluded that the pretrial identification procedures relating to the photographic arrays were not impermissibly suggestive and, even if they were, "[t]he identification of [Fowler] by James Guzman . . . is not inherently incredible, given all the circumstances of the witness's ability to view the accused at the time of the crime. The credibility of the identification evidence is for the jury to weigh." J.A. 197.

On direct appeal, the North Carolina Supreme Court rejected Fowler's challenge to the trial court's denial of his motion to suppress. In pertinent part, the North Carolina Supreme Court held as follows:

> In the present case, the trial court made extensive findings concerning the photographic arrays shown to Guzman and concluded that Guzman's in-court identification was based on his independent

14

recollection of defendant from the night of the crimes. . . . There is ample evidence in the present record to support the trial court's findings. Guzman testified he was confident that defendant was the man he saw in the motel lobby on 31 December 1995. Guzman stated that his identification was based on his memory of seeing defendant in person in the motel lobby on the night of the shootings and not on seeing photographs of defendant. Moreover, the record reveals prosecutors told Guzman when they met with him before the pretrial hearing that he should tell the truth if he did not recognize defendant.

This evidence is sufficient to support the trial court's findings, which in turn support its ultimate legal conclusion that Guzman's identification was not the result of an impermissibly suggestive procedure.

Fowler, 548 S.E.2d at 698. The court also rejected Fowler's argument "that the cumulative effect of viewing photographic arrays and meeting with prosecutors caused Guzman's in-court identification to be a violation of defendant's due process rights," id., observing that:

[n]othing in the trial court's findings or in the evidence suggests that the prosecutors encouraged Guzman to make a false identification. The meeting between prosecutors and Guzman appears to have been nothing more than an opportunity to go over what would happen in court. The prosecutors did not provide Guzman with any information that would not have been readily apparent to him during the proceedings. Thus, although prosecutors should avoid instructing the witness as to defendant's location in the courtroom, there is nonetheless insufficient evidence to support defendant's contention that prosecutors rigged Guzman's identification. Accordingly, although Guzman never explicitly testified that his meeting with prosecutors did not affect his in-court identification, the evidence in the record supports the trial court's conclusion that Guzman's identification was not a result of prosecutorial suggestion.

15

Id. In sum, the court held that the procedures leading up to Guzman's in-court identification were not unnecessarily suggestive and that, even if they were, they did not create a substantial likelihood of irreparable misidentification. See id. at 698-99. In addition, the court held that any violation of Fowler's due process rights "was harmless beyond a reasonable doubt" in light of the other evidence of Fowler's guilt. Id. at 699.

### III.

### A.

Because the North Carolina state courts adjudicated Fowler's constitutional claim on the merits, we may grant habeas relief under 28 U.S.C. § 2254 only if that adjudication (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2).

As the United States Supreme Court has increasingly cautioned, this review of state court decisions on federal constitutional claims is a highly constrained one. We are not at liberty to substitute our judgment for that of the state court on matters of federal constitutional law, even if we

16

believe the state court decision was incorrect. "The question . . . is not whether a federal court believes the state court's determination was incorrect but whether that determination was <u>unreasonable</u> – a substantially higher threshold." <u>Schriro v. Landrigan</u>, 550 U.S. 465, 473 (2007) (emphasis added). A state court decision is unreasonable "only if it is so erroneous that 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with th[e] [Supreme] Court's precedents.'" <u>Nevada v. Jackson</u>, 133 S. Ct. 1990, 1992 (2013) (per curiam) (quoting <u>Harrington v. Richter</u>, 131 S. Ct. 770, 786 (2011)). Furthermore, our deference is not limited to the state court's interpretation and application of Supreme Court precedents. When we review a state court's decision, we must also presume the correctness of the state court's factual findings, unless rebutted by clear and convincing evidence. <u>See</u> 28 U.S.C. § 2254(e)(1).

B.

1.

The district court held that the North Carolina Supreme Court reasonably applied the clearly established Supreme Court precedents in determining that the pre-trial identification process in this case was not impermissibly suggestive. We agree.

17

Law enforcement presented two photographic arrays to Guzman that included Fowler's photograph. Fowler does not argue that the photographic arrays, as individually composed, were unduly suggestive. Rather, Fowler complains only that the pre-trial procedures were unduly suggestive because he appeared in both arrays and because Guzman was told that Fowler would be seated between his counsel prior to the suppression hearing. However, while a photograph of Fowler appeared in both arrays, the same photograph did not appear in both, and it is undisputed that Fowler's appearance in the January 8 array was quite different from his appearance in the January 14 array and from the description provided by Guzman to the authorities in the immediate aftermath of the crime. Moreover, although Guzman selected the photograph of Fowler from the April 14 array as the one most closely resembling the man he saw, he would not positively identify anyone as being the man he saw on the night of the robbery and he was unable to select the same photograph at the suppression hearing.

Nor are we persuaded by Guzman's claim that the state court unreasonably concluded that the prosecutor's pre-hearing meeting with Guzman was not so suggestive - singularly or in combination with the photographic arrays – as to violate Fowler's due process rights, or by his argument that the state court erroneously imposed upon him a burden of proving that the

18

prosecutors were driven by improper motives. There is nothing in the record that calls into question the state court's reasonable determination that the meeting between the prosecutors and Guzman was simply "an opportunity to go over what would happen in court," and that the challenged statement only provided Guzman with information that would "have been readily apparent to him during the proceedings." Fowler, 548 S.E.2d at 698; cf. United States v. Murray, 65 F.3d 1161, 1169 (4th Cir. 1995) (noting that a witness's prior knowledge of a defendant's location at counsel table in a courtroom proceeding was not per se impermissibly suggestive). In the course of concluding that "the evidence in the record supports the trial court's conclusion that Guzman's identification was not a result of prosecutorial suggestion," even in combination with the photographic arrays, the state court also appropriately observed that there was nothing in the record to "suggest[] that the prosecutors encouraged Guzman to make a false identification" or otherwise "rigged Guzman's identification." Fowler, 548 S.E.2d at 698. And, as the state court pointed out, although the prosecutors told Guzman where Fowler would be seated in the courtroom, they also told Guzman "that he should tell the truth if he did not recognize defendant." Id.

19

2.

As both the state court and district court correctly noted, the absence of an unduly suggestive procedure renders it unnecessary for us to go further. Nevertheless, even assuming arguendo that the actions of the police and prosecutor were unduly suggestive, we cannot say that the state court unreasonably concluded that Guzman's identification of Fowler was reliable under the totality of the circumstances.

Guzman observed the accused through a glass door from a distance of 25 feet in fluorescent lighting for approximately five seconds. The accused wore no mask and nothing obstructed Guzman's view of him. Guzman was able to and did observe his facial features from different angles, including when the accused looked in Guzman's direction, and nothing distracted his view away from the man during the time that he observed him. In addition, Guzman was aware of a previous robbery that had occurred at the motel and, therefore, was immediately alert to the possibility that a robbery might be in progress. Furthermore, Guzman provided a detailed description of the accused immediately after the event, including a description of his facial features and of the clothing he was wearing, which turned out to match descriptions given by other witnesses who saw Fowler on the night of the crime.

20

We additionally note that Guzman was consistently hesitant to conclusively identify a suspect from any of the photographic arrays shown to him, whether or not they included a photograph of Fowler. Instead, he did exactly what was asked of him. He picked photographs only when he felt that they resembled the person he saw that night and refused to conclusively identify the culprit until he was sure. When given the first opportunity to observe Fowler in person in October 2007, Guzman, having been told that he should only identify Fowler if he was sure, was confident that Fowler was the person he saw in the lobby of the Howard Johnson's that night. Guzman further testified that his identification was based on seeing Fowler in the lobby that night and not on his having seen any photograph of Fowler. In sum, it was not unreasonable for the state court to find that Guzman based his identification on his observations on the night of the robbery and not on his prior viewing of photographs of Fowler or his knowledge of where Fowler would be located in the courtroom. To the extent that Guzman's identifications were subject to question, the state court reasonably held it was a matter for the jury to consider and weigh and not a basis for excluding the evidence altogether.

3.

Finally, the North Carolina Supreme Court additionally held that, even assuming that error occurred, any due process

21

violation "was harmless beyond a reasonable doubt," in light of the other evidence at trial. <u>Fowler</u>, 548 S.E.2d at 699. Specifically, the court observed that:

> Guzman's in-court identification was by no means the only evidence pointing to defendant's guilt. At trial, three witnesses testified that defendant admitted entering the Howard Johnson's to attempt a robbery and that he shot two people. One witness testified that defendant told him he had only gotten two or three hundred dollars from the robbery and that he was broke because he had paid for his friends to get into the Sugar Shack. Another person testified that defendant sold him a .44-caliber revolver on the evening of 1 January 1996, the day after the murders.

<u>Id.</u> On federal habeas, Fowler argues that he was prejudiced by the admission of Guzman's identification because the only other "evidence linking Fowler to the crime was the testimony of four informants, all of whom approached the State with supposed information about Fowler's case in the hopes of receiving favorable deals and sentencing reductions for their own criminal activity." Brief of Appellant at 33.

On direct review, "[a] constitutional error is harmless when it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." <u>Mitchell v. Esparza</u>, 540 U.S. 12, 17-18 (2003) (per curiam) (internal quotation marks omitted); <u>see</u> <u>also</u> <u>Chapman v. California</u>, 386 U.S. 18, 24 (1967). On federal habeas review, however, we apply the more onerous, harmless error analysis set forth in <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 631 (1993). "Under

22

that standard, an error is harmless unless it had a substantial and injurious effect or influence in determining the jury's verdict." Fry v. Pliler, 551 U.S. 112, 116 (2007) (internal quotation marks omitted). We "assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in Brecht . . . whether or not the state appellate court recognized the error and reviewed it for harmlessness under the [Chapman] standard." Fry, 551 U.S. at 121-22 (noting that "it certainly makes no sense to require formal application of both tests (AEDPA/Chapman and Brecht) when the latter obviously subsumes the former"). And "where an error is harmful under Brecht, any state court decision declaring it harmless must have unreasonably applied Chapman. As a result, any error satisfying Brecht will also satisfy AEDPA's deference requirements." Bauberger v. Haynes, 632 F.3d 100, 104 (4th Cir. 2011). "Federal habeas courts must always review constitutional errors in state trials under Brecht, but they need not debate whether a state court's harmless error determination also unreasonably applied Chapman." Id.

Applying the Brecht standard, we conclude that the admission of Guzman's in-court identification, even if error, was harmless. As the state court observed, there was abundant other evidence presented on the issue of Fowler's guilt,

23

including the testimony of several acquaintances that Fowler admitted that he committed the crime and provided details about the shootings and the murder weapon that were corroborated by the witnesses and forensic evidence from the motel that night.

4.

For the foregoing reasons, we hold that the state court's rejection of Fowler's due process claim was not contrary to or an unreasonable application of the governing Supreme Court precedents. In the alternative, we hold that any such error was harmless under Brecht.

IV.

We turn now to Fowler's motion, filed for the first time on appeal, which he styles as a Motion for Appointment of Qualified and Independent Counsel. Relying upon our decision in Juniper v. Davis, 737 F.3d 288 (4th Cir. 2013), and the Supreme Court's decision in Martinez v. Ryan, 132 S. Ct. 1309 (2012), Fowler asks that that we defer resolution of his habeas appeal, designate his current counsel to be "Martinez counsel," and remand this case to the district court to allow counsel to investigate whether there are any substantial ineffective-assistance-of-trial-counsel claims that were not timely presented to the North Carolina state court. For the following reasons, we deny the motion.

24

A.

1.

Ordinarily, a habeas petitioner is procedurally barred from obtaining federal habeas review of a claim if he failed to raise and exhaust the claim in state court. See Coleman v. Thompson, 501 U.S. 722, 750 (1991); Wainwright v. Sykes, 433 U.S. 72, 84-85 (1977). Under this procedural default doctrine, habeas review of the claim will only be permitted if the petitioner can demonstrate (1) cause for the default and prejudice resulting therefrom or (2) that the failure to consider the claim will result in a fundamental miscarriage of justice. See Coleman, 501 U.S. at 750.

In some circumstances, a defendant may establish cause if he was represented by counsel whose performance was constitutionally ineffective under the standards established in Strickland v. Washington, 466 U.S. 668 (1984). See Coleman, 501 U.S. at 752; Murray v. Carrier, 477 U.S. 478, 488 (1986). In Coleman, however, the Supreme Court held that because "[t]here is no constitutional right to an attorney in state post-conviction proceedings," a federal habeas "petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings" to establish cause. Coleman, 501 U.S. at 752.

In Martinez v. Ryan, 132 S. Ct. 1309, 1315 (2012), the Supreme Court first announced a "narrow exception" to the Coleman rule. Specifically, the Court held that:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was [constitutionally] ineffective.

Id. at 1320 (emphasis added). This limited qualification of the Coleman rule was based on the fact that when an "initial-review collateral proceeding is the first designated proceeding for a prisoner to raise a claim of ineffective assistance at trial, the collateral proceeding is in many ways the equivalent of a prisoner's direct appeal as to the ineffective-assistance claim." Id. at 1317. Thus,

> [W]hen a State requires a prisoner to raise an ineffective-assistance-of-trial-counsel claim in a collateral proceeding, a prisoner may establish cause for a default of an ineffective-assistance claim . . . where appointed counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of Strickland v. Washington, 466 U.S. 668 (1984).

Id. at 1318 (citation omitted). Not long thereafter, the Supreme Court held that the Martinez exception also applies to ineffective-assistance-of-trial-counsel claims that state law might, on its face, permit to be brought on direct appeal, if the "structure and design" of the state "system in actual

26

operation . . . make it 'virtually impossible'" to do so. Trevino v. Thaler, 133 S. Ct. 1911, 1915 (2013). Where the "state procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal, [the] holding in Martinez applies." Id. at 1921.

To summarize, then, Martinez held that a federal habeas petitioner who seeks to raise an otherwise procedurally defaulted claim of ineffective-assistance-of-trial-counsel before the federal court may do so only if: (1) the ineffective-assistance-of-trial-counsel claim is a substantial one; (2) the "cause" for default "consist[s] of there being no counsel or only ineffective counsel during the state collateral review proceeding"; (3) "the state collateral review proceeding was the initial review proceeding in respect to the ineffective-assistance-of-trial-counsel claim"; and (4) state law "requires that an ineffective-assistance-of-trial-counsel claim be raised in an initial-review collateral proceeding." Trevino, 133 S. Ct. at 1918 (internal quotation marks, alterations, and emphasis omitted); see also Martinez, 132 S. Ct. at 1318. Trevino held that the Martinez exception would also apply in states that have procedures which "make[] it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise

27

[the] claim on direct appeal." Id. at 1921. Absent these "limited circumstances," "[t]he rule of Coleman [continues] to govern[]." Martinez, 132 S. Ct. at 1320. The Martinez exception "does not concern attorney errors in other kinds of proceedings, including appeals from initial-review collateral proceedings, second or successive collateral proceedings, and petitions for discretionary review in a State's appellate courts. It does not extend to attorney errors in any proceeding beyond the first occasion the State allows a prisoner to raise a claim of ineffective assistance at trial, even though that initial-review collateral proceeding may be deficient for other reasons." Id. (emphasis added) (citations omitted).

2.

In Juniper v. Davis, 737 F.3d 288 (4th Cir. 2013), we held that a habeas petitioner, who has been sentenced to death and appointed counsel pursuant to 18 U.S.C. § 3599(a)(2) to pursue federal postconviction relief, is entitled to the appointment of qualified, independent legal counsel for the purpose of investigating whether he has any Martinez-based claims if his § 3599 counsel also represented him in the state postconviction proceedings.[6]

---

[6] Pursuant to 18 U.S.C. § 3599, "[i]n any post conviction proceeding under section 2254 or 2255 of title 28, United States Code, seeking to vacate or set aside a death sentence, any (Continued)

In Virginia, where Juniper was convicted, state prisoners cannot raise ineffective-assistance-of-trial-counsel claims on direct appeal and, therefore, the state fell plainly within the Martinez exception.  See Johnson v. Commonwealth, 529 S.E.2d 769, 781 (Va. 2000).  Upon the filing of the petition for federal habeas relief, the district court appointed Juniper's state postconviction counsel to continue representation of him in the federal habeas proceedings.  However, when the Supreme Court issued its decision in Martinez, Juniper moved to have new counsel appointed under § 3599, in addition to his existing counsel, for the purpose of investigating and presenting any substantial, ineffective-assistance-of-trial-counsel claims that had been procedurally defaulted in state court.  In particular, Juniper argued that he was entitled to such new counsel because his existing counsel would otherwise be required to investigate his own ineffectiveness in the state court proceedings.  The district court denied the motion, but granted a certificate of appealability.

On appeal, we held that "if a federal habeas petitioner is represented by the same counsel as in state habeas proceedings,

_____

defendant who is or becomes financially unable to obtain adequate [legal] representation . . . shall be entitled to the appointment of one or more attorneys" meeting the practice qualifications set forth in subsections (b) through (d).

29

and the petitioner requests independent counsel in order to investigate and pursue claims under Martinez in a state where the petitioner may only raise ineffective assistance claims in an 'initial-review collateral proceeding,' qualified and independent counsel is ethically required." Juniper, 737 F.3d at 290 (emphasis in original). This is because "'a clear conflict of interest exists in requiring [petitioner's] counsel to identify and investigate potential errors that they themselves may have made in failing to uncover ineffectiveness of trial counsel while they represented [petitioner] in his state post-conviction proceedings." Id. at 289-90 (quoting Gray v. Pearson, 526 Fed. Appx. 331, 334 (4th Cir. 2013)); see also id. at 290 (noting that it would be "ethically untenable to require counsel to assert claims of his or her own ineffectiveness in the state habeas proceedings in order to adequately present defaulted ineffective-assistance-of-trial-counsel claims under Martinez in the federal habeas proceedings").

We further held that, while Martinez requires that any such claim be ultimately deemed substantial, the "district court must grant the motion for appointment of counsel" for purposes of investigation "without regard to whether the underlying motion identifies a 'substantial' ineffective assistance claim under Martinez." Id.

The state of North Carolina argues that the Martinez exception does not apply in North Carolina because its laws and procedures neither prohibit nor make it "virtually impossible" for a defendant to raise an ineffective-assistance-of-trial-counsel claim on direct appeal.  Fowler, on the other hand, argues that Martinez does apply in North Carolina because, as in Trevino, defendants are ordinarily required to raise claims of ineffective assistance of trial counsel in a motion for appropriate relief.  We disagree with both assertions.

Under North Carolina law, "a motion for appropriate relief, including motions filed in capital cases," must be denied if "[u]pon a previous appeal the defendant was in a position to adequately raise the ground or issue underlying the . . . motion but did not do so."  N.C.G.S. § 15A-1419(a)(3), (b).  However, the statute "is not a general rule that any claim not brought on direct appeal is forfeited on state collateral review.  Instead, the rule requires North Carolina courts to determine whether the particular claim at issue could have been brought on direct review."  McCarver v. Lee, 221 F.3d 583, 589 (4th Cir. 2000).

Ineffective-assistance-of-trial-counsel "claims brought on direct review will be decided on the merits when the cold record reveals that no further investigation is required, i.e., claims that may be developed and argued without such ancillary

31

procedures as the appointment of investigators or an evidentiary hearing." State v. Fair, 557 S.E.2d 500, 524 (N.C. 2001). Otherwise, the claims "should be considered through motions for appropriate relief and not on direct appeal." State v. Stroud, 557 S.E.2d 544, 547 (N.C. Ct. App. 2001). "Thus, while in some situations a defendant may be required to raise an [ineffective-assistance-of-trial-counsel] claim on direct appeal, a defendant will not be required to do so in all situations." State v. Long, 557 S.E.2d 89, 93 (N.C. 2001). Accordingly, "to avoid procedural default under N.C.G.S. § 15A-1419(a)(3), defendants should necessarily raise those [ineffective-assistance-of-trial-counsel] claims on direct appeal that are apparent from the record." Fair, 557 S.E.2d at 525 ("commend[ing]" counsel "for properly raising [five] claims [of ineffective assistance of counsel] on direct appeal"). "[S]hould the reviewing court determine that [ineffective-assistance-of-trial-counsel] claims have been prematurely asserted on direct appeal, it shall dismiss those claims without prejudice to the defendant's right to reassert them during a subsequent MAR proceeding." Id.

In sum, North Carolina does not fall neatly within Martinez or Trevino. Ineffective-assistance-of-trial-counsel claims that are apparent from the record must be brought by the prisoner on direct appeal and, as to those claims, "the state collateral review proceeding [is not] the initial review proceeding in

32

respect to the . . . claim." Trevino, 133 S. Ct at 1918 (internal quotation marks omitted). Accordingly, they are subject to procedural default under N.C.G.S. § 15A-1419, and the Martinez exception to Coleman will provide the prisoner no relief on federal habeas. Ineffective-assistance-of-trial-counsel claims that are not so apparent, however, will fall within the Martinez exception.

In Juniper and Gray, we held that qualified, independent counsel must be appointed in a Martinez state for the purpose of determining whether any additional, ineffective-assistance-of-trial-counsel claims exist which were not brought on state habeas. Because some claims may fall within the Martinez exception to Coleman, North Carolina petitioners are therefore entitled upon request to the appointment of qualified, independent counsel for the purposes of investigating whether any such claims exist. However, the federal habeas court will still be called upon to determine, on a case-by-case basis, whether the particular ineffective-assistance-of-trial-counsel claim identified, regardless of its merit, is nonetheless procedurally defaulted because it could have been and should have been raised on direct appeal.

C.

That said, Fowler is not entitled to the relief he seeks before this court. Unlike the petitioners in Juniper and Gray,

33

Fowler had the benefit of qualified, independent counsel during the pendency of his federal habeas petition below who had ample opportunity to pursue any Martinez-based arguments on his behalf.

During the various stages of Fowler's trial and collateral proceedings, he has had the benefit of at least nine death-penalty qualified attorneys. At trial, Fowler was represented by Kevin Barnett and Harold Bender. On direct appeal, he was appointed new counsel, James Glover, to review the trial court record and pursue appropriate claims, including ineffective-assistance-of-counsel claims.

After his conviction and sentence were affirmed and certiorari review denied, Fowler was appointed qualified postconviction counsel, Zephyr Teachout and Stephen Greenwald, to pursue postconviction relief. Fowler's original Motion for Appropriate Relief was filed on November 12, 2002, and amended on August 12, 2004. During the pendency of his MAR proceeding, however, Fowler's postconviction counsel were relieved and he was appointed a second set of qualified postconviction counsel, Faith Bushnaq and Reita Pendry, who also reviewed the matter and filed an amendment to the MAR, which included an additional ineffective-assistance-of-trial counsel claim.

After relief was denied in state postconviction proceedings, Bushnaq and Pendry sought and received an

34

appointment to represent Fowler in his federal habeas proceedings. Pendry filed an affidavit attesting to both her and Bushnaq's qualifications to represent Fowler under § 3599(c) and (d). On February 12, 2009, Pendry and Bushnaq filed a Petition for Writ of Habeas Corpus. The state filed its response in May 2009, and Fowler filed a reply to the response in August 2009.

On October 11, 2011, however, Fowler's current counsel, Shelagh Kenney with the Center for Death Penalty Litigation, successfully moved on Fowler's behalf for an order appointing her to replace Pendry. In conjunction with this motion, Kenney also represented to the district court that she met the qualifications to undertake representation under § 3599(c) and (d), and additionally asserted that her entire practice is devoted to the representation of indigent defendants who have been sentenced to death. The district court also granted, at Kenney's request, "a sixty (60) day abeyance of any rulings" on the federal habeas petition, "without prejudice to [Fowler's] requesting additional time, if necessary," Docket Entry No. 21, Fowler v. Branker, No. 3:09-cv-00051 (W.D.N.C. Oct. 19, 2013), in order to give newly appointed federal habeas counsel "sufficient time to inform herself about Mr. Fowler's case," Docket Entry No. 20, Fowler v. Branker, No. 3:09-cv-00051 (W.D.N.C. Oct. 11, 2011).

35

Martinez, which had been fully briefed and was pending argument in the Supreme Court at the time of Kenney's appointment, was decided on March 20, 2012. Moreover, the district court did not issue its decision denying Fowler's federal habeas petition until March 27, 2013, a year after the decision in Martinez was issued. However, at no time during the pendency of her representation did Kenney seek to amend the federal habeas petition to assert additional ineffective-assistance-of-trial-counsel claims, or request a further abeyance of the case to allow for any additional investigation of any potential new claims.

Thus, although styled as a "Motion for Appointment of Qualified and Independent Counsel in Light of Juniper," it turns out that Fowler's motion, filed before this court for the first time, does not seek appointment of new, independent counsel pursuant to Juniper at all. Although Fowler was initially represented in his federal habeas proceedings by his second set of state postconviction counsel, he was appointed and had the benefit of qualified, independent counsel pursuant to § 3599 for a substantial period of time during the pendency of his federal habeas petition in the district court. Our holding in Juniper was limited and explicit:

> To be clear, if a federal habeas petitioner is represented by the same counsel as in state habeas proceedings, and the petitioner requests independent

36

> counsel in order to investigate and pursue claims under <u>Martinez</u> in a state where the petitioner may only raise ineffective assistance claims in an 'initial review collateral proceeding," qualified and independent counsel is <u>ethically required</u>.

<u>Juniper</u>, 737 F.3d at 290 (third emphasis in original). However, where, as here, counsel who represents the petitioner in federal habeas proceedings "undertook representation <u>after</u> the initial-review collateral proceeding concluded, that counsel cannot be found ineffective before or after <u>Martinez</u>. Ethically, this means there is no potential conflict of interest in light of <u>Martinez</u> because there is no chance that the attorney would have to argue his or her own ineffectiveness or forego a potentially valid ineffective assistance of counsel claim." David M. Barron, <u>Martinez Casts Doubt on State PostConviction and Federal Habeas Representation</u>, 27-Fall Crim. Just. 42 (2012) (emphasis added).

Kenney is without doubt well qualified and informed in death penalty matters. She represented Fowler for a year and a half during the pendency of the district court proceedings, and she did <u>not</u> represent Fowler at any stage of the state MAR proceedings. Thus, she did not labor under <u>any</u> conflict of interest that would have hindered her ability to investigate whether there were any <u>Martinez</u>-based ineffective-assistance-of-trial-counsel claims that had not already been ferreted out by Fowler's prior trial and postconviction counsel, or entitled

37

Fowler to the appointment of new, "conflict-free" counsel under § 3599.[7]

We are also unpersuaded by Fowler's half-hearted argument that a special designation of "Martinez counsel" and remand for further investigation is warranted because the Juniper decision was not issued until after Fowler filed his appeal. The decisions in both Juniper and Gray addressed a conflict-of-interest argument that was timely made before the district court immediately after the Martinez decision was handed down by the Supreme Court, and were based upon its reasoning and holding. See e.g. Juniper, 737 F.3d at 289 ("In accordance with Martinez, the Gray panel held that the petitioner was entitled to independent counsel in his federal habeas proceedings to investigate and pursue the ineffectiveness of state habeas counsel."); Gray, 526 Fed. Appx at 332 ("[U]nder the reasoning and holding of Martinez, [petitioner] is entitled to counsel who could vigorously examine and present if available potential claims of ineffective assistance by [his] counsel in his state habeas proceedings."). Juniper's counsel was qualified, but not

---

[7] In Juniper, the petitioner had a second appointed counsel who had not represented him in the state postconviction proceedings, but this counsel was not qualified under 18 U.S.C. § 3599(c) to represent him independently. Here, in contrast, Kenney was qualified and, therefore, "serve[d] as the independent counsel called for in" Juniper. Juniper v. Davis, 737 F.3d 288, 290 n.2 (4th Cir. 2013).

independent, and therefore Juniper was in a position to argue that his appointed counsel operated under a conflict of interest entitling him to new counsel under § 3599. Kenney, in contrast, has at all times been independent and conflict-free. Moreover, there is no magic to the term "Martinez counsel," which does not appear in Juniper or Gray. The term is but a shorthand reference to the qualified, independent counsel that Juniper held was ethically required under § 3599 in the narrow set of circumstances presented. Juniper did not grant a federal habeas petitioner and his independent counsel any right, on appeal, to return to the district court and conduct additional Martinez investigations or to otherwise vary our normal rule that arguments such as these, including a petitioner's motion for new counsel in light of Martinez, should have been made in the first instance to the district court.

In sum, Martinez provided Fowler's counsel with all the authority necessary to request an additional abeyance of the district court's ruling and, if appropriate, to file an amended habeas petition. No explanation for this delay has been offered. Unlike the petitioners in Juniper and Gray, Fowler did not seek appointment of independent, qualified counsel under Martinez in the district court. Kenney already met that criteria. Nor did Fowler or Kenney, upon her appointment, seek additional time to investigate whether there were any additional

39

ineffective-assistance-of-trial-counsel claims which Martinez might allow the district court to consider, leaving us with the unmistakable impression that there was nothing of substance left to investigate. Counsel may or may not have investigated whether Fowler's two sets of qualified, state postconviction counsel were constitutionally ineffective in failing to identify and present an ineffective-assistance-of-trial-counsel claim. But even if such Martinez-based claims existed, they have been waived by Fowler's failure to raise the issue below, and any ineffectiveness on Kenney's part provides Fowler with no relief here.

V.

For the foregoing reasons, we affirm the judgment of the district court denying Fowler's petition for habeas relief. We also deny Fowler's motion for appointment of qualified and independent counsel under Martinez and Juniper.

JUDGMENT AFFIRMED;
MOTION DENIED

DAVIS, Senior Circuit Judge, concurring in the judgment in part and dissenting in part:

I strongly disagree with the weathered notion that when it comes to eyewitness identification evidence, "[c]ourts should be 'content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill,'" and that "'[j]uries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature.'" See maj. op. at 10 (quoting Manson v. Brathwaite, 432 U.S. 98, 116 (1977)). The hundreds of exonerations splashed across the headlines of popular and legal media over the last decade put the lie to the Supreme Court's outworn hope that juries can be counted on routinely to reject unreliable eyewitness identification evidence without special guidance from courts. See generally Laura Sullivan, Exonerations On The Rise, And Not Just Because Of DNA, National Public Radio (Feb. 4, 2014, 3:47 AM) (saved as ECF Opinion Attachment). Nevertheless, largely for reasons set forth in the Chief Judge's thorough opinion, I concur in the judgment that Fowler is not entitled to relief under 28 U.S.C. § 2254.

As for the motion to appoint counsel pursuant to the teachings of Juniper v. Davis, 737 F.3d 288 (4th Cir. 2013), I would remand determination of the issue to the district court

41

for its examination in the first instance. If the district court denied the motion, then Fowler would be free to seek from the district court or this Court a certificate of appealability. Accordingly, I dissent from the panel's denial of the motion.