**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 16-4680**

_____

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

v.

JAMAL ANTWAN LEWIS, a/k/a Buck,

        Defendant – Appellant.

------------------------------

THE INNOCENCE PROJECT, INC.,

        Amicus Supporting Appellant.

_____

Appeal from the United States District Court for the District of South Carolina, at Florence.  R. Bryan Harwell, District Judge.  (4:15-cr-00713-RBH-1)

_____

Argued:  October 26, 2017                          Decided:  February 27, 2018

_____

Before DUNCAN and THACKER, Circuit Judges, and Max O. COGBURN, Jr., United States District Judge for the Western District of North Carolina, sitting by designation.

_____

Affirmed by unpublished opinion.  Judge Duncan wrote the majority opinion, in which Judge Cogburn joined.  Judge Thacker wrote a dissenting opinion.

_____

**ARGUED:** Kimberly Harvey Albro, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Columbia, South Carolina, for Appellant. Christopher Dolan Taylor, OFFICE OF THE UNITED STATES ATTORNEY, Florence, South Carolina, for Appellee. **ON BRIEF:** Beth Drake, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for Appellee. Barry C. Scheck, Karen A. Newirth, THE INNOCENCE PROJECT, INC., New York, New York; David S. Frankel, Evie Spanos, Aaron L. Webman, KRAMER LEVIN NAFTALIS & FRANKEL LLP, New York, New York, for Amicus The Innocence Project, Inc.

_____

Unpublished opinions are not binding precedent in this circuit.

DUNCAN, Circuit Judge:

Jamal Antwan Lewis appeals both his conviction for being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2) and 924(e) and the application of the Armed Career Criminal Act (the "ACCA"), 18 U.S.C. § 924(e), enhancement to his sentence for that conviction. Lewis challenges his conviction on two grounds. First, Lewis contends that the two witnesses identifications made during a "show-up procedure" and the subsequent in-court identification were unnecessarily suggestive and unreliable, and therefore the district court erred by denying his motion to suppress them. Second, he argues that the district court erred by denying his motion for a mistrial and rejecting his objection to the sentencing enhancement. Although we strongly disapprove of the manner in which the police handled the show-up here, we are nevertheless compelled to affirm both Lewis's conviction and sentence for the reasons that follow.

I.

This case resulted from a shooting incident that took place at the Cedar Street Apartment Complex in Myrtle Beach, South Carolina, on March 30, 2015, at around 8 p.m. Two witnesses, Kelly Shuler and Christopher Alexander, both Cedar Street residents, identified Lewis as the shooter during a "show-up" identification procedure. Lewis moved to suppress these identifications and the district court held a suppression hearing. After hearing testimony from Shuler, Alexander, and police officers on the scene, the district court denied the motion.

In setting forth the facts below, we draw on testimony from the suppression hearing and trial, indicating, where significant, from which proceeding the testimony originated.

A.

Kelly Shuler testified at the suppression hearing that she was smoking a cigarette outside of her apartment at approximately 8 p.m. when she witnessed a black male wearing dark outer clothing with a lighter undershirt standing in the street firing a pistol. J.A. 93, 102. When the individual pointed the gun in her direction she backed away and entered the apartment that she shared with Christopher Alexander. After Shuler told Alexander what had happened, the two went back outside to see if anyone was injured.

Alexander testified at the hearing that when he went outside with Shuler, he saw a male exiting the wooded area adjacent to the apartment complex while "cycling" a black .45 caliber gun as if to clear a jam. He saw a cartridge in the parking lot that appeared to have been ejected from the gun. The individual ran towards the parking lot where Shuler and Alexander were standing. Alexander testified that because the individual was between 24–36 inches away from the couple, J.A. 116, Alexander "looked at him right square in the face." J.A. 123. Similarly, Shuler testified that the individual was "less than a car length" away from her. J.A. 98. At the suppression hearing, Alexander testified that the individual had on dark clothing and white pants. The individual then ran to Apartment Six, knocked on the door, and was allowed to enter. Alexander and Shuler returned to their apartment and Alexander called the police. Alexander testified at the

4

hearing that he remembered telling the 911 operator that the suspect was wearing a baseball hat for a Los Angeles team but, during the hearing, Alexander did not specifically remember whether the individual was actually wearing a hat that night.

A woman named Venus Saintonge lived in Apartment Six. Saintonge testified at trial that she had drifted off to sleep when Lewis knocked on her door. She was familiar with Lewis because he was her roommate's boyfriend and had previously visited the apartment. She testified that when she let Lewis in he had a black gun that he was "messing with" and "trying to maneuver." J.A. 220.

Police received the 911 call at 8:06 p.m. and law enforcement arrived on the scene shortly after at 8:12 p.m. Upon arrival, the officers immediately interviewed Alexander and Shuler. Officer Brittany Southerland testified at the suppression hearing that Shuler and Alexander both identified the suspect as a black male, with a small to medium build, wearing a dark shirt or upper clothing and jeans. She said that one of the witnesses mentioned that the suspect was wearing a Los Angeles Kings fitted hat but she did not remember which. She testified that both witnesses told her that the suspect ran into Apartment Six.

While on the scene, Detective William Kitelinger obtained Saintonge's phone number and called her. That evening Saintonge first told Detective Kitelinger over the phone that she was at work, though she was, in fact, in the apartment with Lewis.

At the suppression hearing, officers testified that they next secured the area around Apartment Six. Officer Steven Riesbell testified that he was stationed at the front door of the apartment. Officer Angel Walker testified at the suppression hearing that

5

once she had arrived on the scene there were already officers at the back door of the apartment.

Officer Walker testified that the officers discovered security footage from a neighboring apartment complex's security cameras showing an altercation between two black males in the apartment's parking lot in which one man shot the other.[1] She stated that the shooter was an individual that matched the description of the suspect given to her by officers that were already on the scene when she arrived--a black male wearing dark clothing and a Los Angeles Kings hat. She said that the video showed the shooter enter Apartment Six after the incident.

Based on the video footage, law enforcement obtained and executed a search warrant for Apartment Six. The officers found Lewis and Saintonge inside. Saintonge testified at trial that when officers entered her apartment she was standing in the corner of her closet and Lewis was standing by the window. The officers also found drugs in the apartment.

Officer Stephen Thrackray testified at trial that Saintonge and Lewis were found in the apartment that night along with a gun. At trial, Saintonge identified the gun that the officers recovered at the scene as the gun that Lewis brought to her apartment that night. Officer David Bailey testified at trial that he found two unfired .45 caliber cartridges, one in the parking lot and one just to the left of the of the complex. J.A. 281. He testified

---

[1] The video was not preserved for trial and therefore was not shown to the district court or the jury.

6

that he observed a .45 caliber weapon in Saintonge's bedroom with a magazine still in it. The majority of the bullets found in the cartridge in the gun that the officers found at the apartment were of the same brand as the ones found in the parking lot. When asked how the bullets might have ended up in the parking lot, Officer Bailey stated that the individual might have been clearing a "jam." J.A. 293.

Around midnight that night, officers ran a show-up identification procedure with both Shuler and Alexander. When officers put Shuler in the back of the patrol car to run the show-up procedure, the patrol car video showed that they initially showed her two photos.[2] The officers asked if the man in the photographs was the man that she had seen and she said that she "believe[d] so" although she did not remember if the individual that she saw had a neck tattoo, like the man in the photo. The officers then brought Lewis out, and Shuler confidently stated, "that's him." In the patrol car video, Lewis appears to be wearing a black shirt with a white design and light-colored pants.

The video shows that the officers conducted Alexander's show-up identification procedure in a similar fashion to how they had conducted Shuler's. It appears that the officers may have shown Alexander one photograph.[3] When the officers brought Lewis

---

[2] These photos were presumably of Lewis, although they were not preserved and were not shown to the district court or to the jury. The dissent states that the eyewitnesses were shown a picture of Lewis and "only Lewis," *infra* at 24, and it later acknowledges that Detective Kitelinger only stated that one photo was of Lewis in his testimony and did not mention the other. *Infra* at 26–27 n.4; *see* J.A. 328. Because neither of the photos were preserved for trial, we assume that both were of Lewis.

[3] Alexander testified at the suppression hearing that he did not remember if the officers showed him a photograph but he did not think they had.

7

out and asked Alexander if Lewis was the person that he had seen earlier with the gun, Alexander stated, "I'll tell you right now, that's him."

Lewis was later arrested and indicted in a one count charge of, having been convicted of a "crime punishable by imprisonment for a term exceeding one year," possessing a firearm in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2) and 924(e). 18 U.S.C. §§ 922(g)(1). Prior to trial, Lewis moved to suppress both Shuler's and Alexander's out-of-court identifications and any subsequent in-court identifications.

## B.

At the suppression hearing on March 29, 2016, Alexander, Shuler, as well as Officers Riesbell, Southerland, and Walker testified. Shuler could not identify Lewis at the hearing. However, she testified that she was completely sure that the person she identified that night during the show-up was, indeed, the person that she had seen with the gun. Alexander identified Lewis, in court, as the man that he had seen that night.

After the hearing, the district court entered an order denying Lewis's suppression motion because it found that even assuming that the show-up identification was unnecessary and suggestive, given the totality of the circumstances, Shuler's and Alexander's identifications were nevertheless reliable. It found that Alexander's subsequent in-court identification was therefore also proper.

## C.

Both Shuler and Alexander testified at trial. The government used the video of the show-up procedure during Shuler's trial testimony. A window popped up on the video screen with the caption, "attempted murder." Lewis objected and moved for a mistrial. The district court denied the motion but provided, instead, a curative instruction to the jury. The district court instructed the jury not to consider the pop-up panel as it was not evidence in the case and clarified that Lewis was only being charged with being a felon in possession of a firearm or ammunition. J.A. 267. The court asked the jury "is there anyone who could not still be fair and impartial to Mr. Lewis and give him a fair trial?" *Id.* The court then, more pointedly, asked if there was anyone that could not follow the court's instructions to disregard the pop-up screen. *Id.* No juror answered either question affirmatively and the district court therefore proceeded with the rest of the trial.

Saintonge answered questions at trial about why she had not been truthful to Detective Kitelinger when she spoke to him on the phone that evening. She testified that she told Detective Kitelinger that she was at work at the time because Lewis told her not to tell Detective Kitelinger that she was at home with him. She testified that she lied out of fear of Lewis, who had a gun. Saintonge testified that she did not tell the officer that night about the gun or that Lewis told her to lie on the phone. She did so because she was afraid of Lewis and what he might do to her if she ran into him after he was released, and she stated that she was very nervous that night.

9

She also answered questions regarding her motivations for testifying against Lewis. Saintonge was charged as an accessory after the fact to Lewis's firearm possession charge and with a drug charge. She stated that she did not receive any promises contingent on her testimony in the instant case.

## D.

The jury found Lewis guilty on May 3, 2016. The presentence report determined that an ACCA enhancement applied because Lewis had been convicted of four prior violent felony convictions, two of which were for Criminal Domestic Violence of a High and Aggravated Nature ("CDVHAN"), S.C. Code Ann. § 16-25-65(A) (2011). Under the ACCA, defendants that violate § 922(g) and have been convicted of three previous violent felonies receive a mandatory minimum sentence of fifteen years imprisonment. 18 U.S.C. § 924(e). Lewis objected, arguing that CDVHAN was not an ACCA predicate offense. The district court overruled Lewis's objection to the classification of CDVHAN as a violent felony and sentenced Lewis to 262 months imprisonment followed by a five-year term of supervised release.

## II.

Lewis challenges his conviction and sentence. We address each challenge in turn.

A.

Lewis challenges the district court's judgment on two grounds: (1) the two out-of-court witness identifications made during the "show-up" identification procedures and the subsequent in-court identification should have been suppressed because the show-up procedure was unnecessary, suggestive, and unreliable; and (2) he was entitled to a mistrial because of an inappropriate pop-up message that was shown to the jury during a video of the witness identification procedure.

1.

Although we hold that, considering the totality of the circumstances, the district court did not err in finding that the identifications were reliable, we in no way condone the police show-up procedure, which is saved primarily by the fact that we review factual findings for clear error. *See United States v. Stevenson*, 396 F.3d 538, 541 (4th Cir. 2005).

In reviewing a denial of a motion to suppress, we review legal conclusions de novo and factual findings for clear error. *Id.* A district court's factual finding is clearly erroneous when the court is "left with the definite and firm conviction that a mistake has been committed." *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). Thus, when "there are two permissible views of the evidence, the [district court's] choice between them cannot be clearly erroneous." *Stevenson*, 396 F.3d at 542 (quoting *Anderson,* 470 U.S. at 574). In reviewing the denial of a motion to suppress we view the evidence in the light most

11

favorable to the government, the prevailing party below. *United States v. Uzenski*, 434 F.3d 690, 704 (4th Cir. 2006).

The Supreme Court has developed a two-part test for determining whether eyewitness identification should be suppressed as a violation of a defendant's due process rights. First, the court must consider whether the identification procedure was "both suggestive and unnecessary." *Perry v. New Hampshire*, 565 U.S. 228, 239 (2012). If so, the court assesses "on a case-by-case basis, whether improper police conduct created a 'substantial likelihood of misidentification.'" *Id. (*quoting *Neil v. Biggers,* 409 U.S. 188, 201 (1972)). Stated differently, the court must determine "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." *Biggers*, 409 U.S. at 199.

Courts consider the following factors established in *Biggers* to determine whether an identification was reliable notwithstanding a suggestive identification procedure: (1) "the opportunity of the witness to view the criminal at the time of the crime"; (2) "the witness' degree of attention"; (3) "the accuracy of the witness' prior description of the criminal"; (4) "the level of certainty demonstrated by the witness at the confrontation"; and (5) "the length of time between the crime and the confrontation." *Id.* at 199–200. "These factors are weighed against 'the corrupting effect of the suggestive identification itself.'" *Fowler v. Joyner*, 753 F.3d 446, 453 (4th Cir. 2014) (quoting *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977)). "Moreover, the exclusion of such evidence is the exception to the rule that favors the admissibility of eyewitness identification for the jury's consideration." *Id*.

12

As the dissent correctly notes, the identification procedures employed by the police on the night of the incident were certainly concerning, and we assume for the purposes of our analysis that they were both "unnecessary" and "suggestive." However, given the totality of circumstances and the fact that we must view the evidence in the light most favorable to the government, we hold that the district court did not err in determining that there were "sufficient indicia of reliability with respect to Shuler's identification." *United States v. Lewis*, Crim. No.: 4:15-cr-00713-RBH-1 at 10, ECF No. 49 (D.S.C. April 11, 2016). We begin by reviewing the district court's factual findings in its *Biggers* analysis for Shuler's and Alexander's identifications respectively.

a.

Viewing the evidence in the light most favorable to the government as the prevailing party below, the district court did not err in its factual findings concerning Shuler's identification. As to the first *Biggers* factor, the district court did not err in finding that Shuler had a sufficient opportunity to "view the criminal at the time of the crime." *See Biggers,* 409 U.S. at 199. Although Shuler testified at the hearing that she did not get a good chance to see the suspect at the time of the shooting, she did say that the suspect passed by her when she came back out to see what was happening. J.A. 112. She testified that at this point the suspect was "very close [and] less than a car length" away from her. J.A. 98. Alexander confirmed this fact in his testimony, stating that the suspect passed 24-36 inches away from the pair. J.A. 116.

As for the second factor, the evidence suggests that Shuler was paying attention because she went back outside for the specific purpose of investigating the situation.

13

With respect to the third factor, the description of the suspect that Shuler gave to Officer Southerland at the scene of the crime was mostly consistent, outside of the shade of pants, with how Lewis actually appeared that night. Shuler described the suspect to Officer Southerland as a black male, with a small to medium build, wearing a dark shirt or upper clothing and jeans. J.A. 46, 48. As the district court noted, the video of the show-up procedure shows that Lewis is a black male and was wearing a dark-colored shirt and light-colored pants that could have been jeans. *See* CD Ex.1, 2; J.A. 150.

With respect to the fourth factor, Shuler demonstrated a high level of certainty in her identification. Shuler stated confidently, "that's him" when Lewis was escorted out during the show-up procedure. She even stated that she was "[c]ompletely" sure of her identification that night. J.A. 96. Furthermore, she had seen the suspect before "several times." J.A. 93. The dissent finds the fact that Shuler could not identify Lewis in court almost a year later to be significant, which it may be, but viewing the evidence in the light most favorable to the government it is not clear that the district court erred in its factual determination about her degree of certainty on the night that she made the identification.

With respect to the fifth factor, we similarly find that the time between the incident and the confrontation does not suggest unreliability. As the dissent acknowledges, we have held that a photo identification that took place two hours after a robbery occurred when the witness's recollection was "still fresh." *United States v. Saunders*, 501 F.3d 384, 392 (4th Cir. 2007). And if in *Biggers,* the seminal case establishing when an out-of-court identification is reliable, the Supreme Court held that

14

given the unique circumstances in that case even an identification done seven months after the incident took place was sufficiently reliable, the approximately four-hour time period in this case presents less of a hurdle. *Biggers*, 409 U.S. at 201. *See also Manson,* 432 U.S. at 116 (finding reliability where the photo identification took place two days after the incident).

Viewing these facts in the light most favorable to the government, the evidence indicates that Shuler's ability to make a reliable identification was not outweighed by the corrupting effect of the unnecessarily suggestive show-up procedure.

b.

Nor did the district court err in determining that Alexander's identification was reliable. With respect to the first factor, Alexander testified that the suspect came within 24–36 inches from him and that he could clearly see the suspect's face. J.A. 116, 123. As for the second factor, Alexander observed the suspect with a degree of attention sufficient to be able to identify his gun. With respect to the third factor, like Shuler's identification, Alexander's identification was relatively consistent with how Lewis appeared that night. Officer Southerland stated that Alexander identified the suspect as a black male, with a small to medium build, wearing a dark shirt or upper clothing. This description matches how Lewis appeared on the video of the show-up procedure. As to the fourth factor, Alexander testified that he was 99.9 percent certain about his identification that night. J.A. 120. On the fifth factor, as was the case with Shuler's, law enforcement ran Alexander's show-up procedure merely a few hours after the incident. Viewing these facts in the light most favorable to the government, the evidence indicates

15

that Alexander's, like Shuler's, ability to make a reliable identification was not outweighed by the corrupting effect of the unnecessarily suggestive show-up procedure.

c.

Furthermore, the record contains additional evidence supporting the conclusion that Shuler's and Alexander's testimony was reliable. *Saunders*, 501 F.3d at 391–92 (citing *United States v. Wilkerson,* 84 F.3d 692, 695 (4th Cir. 1996)) ("[C]ourts may 'consider other evidence of the defendant's guilt when assessing the reliability of the . . . identification.'" ).[4] First, both Shuler and Alexander testified that they saw Lewis enter Apartment Six. The officers secured the apartment once they arrived on the scene and found Lewis and Saintonge in the bedroom of the apartment with a gun matching the description that Alexander gave and that was consistent with the type of shell casings found in the parking lot.

Although it plays no part in our analysis, the reliability of the identifications is "hardly undermined" by the fact that Saintonge knew and identified Lewis. *Manson*, 432 U.S. at 116. She testified that Lewis entered her apartment with a gun. Even though her testimony at trial was inconsistent with what she told police the night of the incident, Saintonge testified under oath at trial that she had not been truthful to the police that night

---

[4] We have stated in *United States v. Greene*, 704 F.3d 298 (4th Cir. 2013) that "evidence extrinsic to an identification cannot be considered in evaluating the reliability of the identification." *Id.* at 310. The evidence that follows is not, however, extrinsic to the identification because it, in part, comes from the challenged witnesses and otherwise corroborates the description and identification of the suspect and the description of the events that the challenged witnesses provide. *See id.* at 310 n.5 (distinguishing *Saunders*).

16

because she was afraid of Lewis, who had a gun. The dissent points to the fact that Saintonge told the officers that night that someone other than Lewis had come in and gone through the apartment, but fails to note that Saintonge stated in her testimony that Lewis instructed her to say that. *See infra* at 47; J.A. 239. She further testified that she did not offer her testimony against Lewis in an attempt to affect her then-pending state court case.

We therefore find no reason to hold that the district court clearly erred in its factual findings underlying the *Biggers* analysis. Moreover, small variations in the witnesses' description of what the suspect was wearing or the fact that the witness may have been nervous does not, alone, destroy the reliability of their identification here. Ultimately, we are constrained by the standard of review. We review factual findings underlying the *Biggers* analysis for clear error, and, we are compelled to view the evidence in light most favorable to the government, the prevailing party below. *Uzenski*, 434 F.3d at 704. Although the dissent acknowledges that we review factual findings for clear error, it does not appear to do so. Accordingly, considering the totality of the circumstances, we find that the district court did not err in denying Lewis's motion to suppress.

2.

Next, Lewis argues that he is entitled to a mistrial because "attempted murder" appeared on the screen when the jury saw the identification video. Because the trial court gave the jury a curative instruction, we hold that the district court did not abuse its discretion in denying Lewis's motion for a mistrial.

17

We review the district court's denial of a mistrial and issuance of curative instruction for abuse of discretion. *United States v. Wallace*, 515 F.3d 327, 330 (4th Cir. 2008). "An abuse of discretion exists if . . . the defendant [can] show prejudice; no prejudice exists, however, if the jury could make individual guilt determinations by following the court's cautionary instructions." *Id.* (quoting *United States v. Dorsey*, 45 F.3d 809, 817 (4th Cir. 1995)). "We normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an 'overwhelming probability' that the jury will be unable to follow the court's instructions and a strong likelihood that the effect of the evidence would be 'devastating' to the defendant." *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987) (quoting *Richardson v. Marsh*, 481 U.S. 200, 208 (1987); *Bruton v. United States*, 391 U.S. 123, 136 (1968)).

Lewis argues that the attempted murder pop-up screen was akin to introducing improper character evidence because it implied that Lewis was implicated in an attempted murder. However, the government did not allude to or rely on it. More significantly, the judge made clear that Lewis was not charged with attempted murder. When asked, no juror stated that he or she would not be able to follow the curative instruction. If Lewis did suffer any prejudice, Lewis has failed to show an "overwhelming probability" that the jury was not able to follow the curative instructions and that there was a "strong likelihood of a devastating effect." *See id.*

We therefore conclude that the district court did not abuse its discretion in denying a mistrial.

B.

Finally, Lewis argues that his CDVHAN conviction did not constitute a violent felony under the ACCA, and that, as a result, he received a sentencing enhancement for which he did not qualify. We disagree.

Under the ACCA, prior convictions for three violent felonies will result in a sentence enhancement. A violent felony is one that "has as an element the use, attempted use, or threatened use of physical force against the person of another." 18 U.S.C. § 924(e)(2)(B)(i). Physical force has been interpreted to mean violent force or "force capable of causing physical pain or injury to another person." *Johnson v. United States*, 559 U.S. 133, 140 (2010).

Under South Carolina law, an individual is guilty of CDVHAN when the individual commits the offense of criminal domestic violence ("CDV") along with committing aggravating conduct. A person has committed CDV if he or she "(1) cause[s] physical harm or injury to a person's own household member; or (2) offer[s] or attempt[s] to cause physical harm or injury to a person's own household member with apparent present ability under circumstances reasonably creating fear of imminent peril." S.C. Code Ann. § 16–25–20(A) (2011).[5] In the version of the statute under which Lewis was convicted, an individual has committed CDVHAN when, having committed CDV, the person also "commits: (1) an assault and battery which involves the use of a deadly

---

[5] The statute was subsequently amended.

19

weapon or results in serious bodily injury to the victim; or (2) an assault, with or without an accompanying battery, which would reasonably cause a person to fear imminent serious bodily injury or death." S.C. Code Ann. §16-25-65(A) (2011). Therefore, CDV is a component of CDVHAN.

We apply the categorical approach. *See United States v. Hemingway*, 734 F.3d 323, 328 (4th Cir. 2013). "The categorical approach focuses on the *elements* of the prior offense rather than the *conduct* underlying the conviction." *United States v. Cabrera–Umanzor*, 728 F.3d 347, 350 (4th Cir. 2013). Courts look at "'the minimum conduct necessary for a violation' under state law." *United States v. Gardner*, 823 F.3d 793, 803 (4th Cir. 2016) (quoting *Castillo v. Holder*, 776 F.3d 262, 267 (4th Cir. 2015)). However, the categorical approach does not "require that we strain credulity or apply our legal imagination to the statute's language to arrive at some violation of the statute that would not qualify as a 'crime of violence.'" *United States v. Diaz-Ibarra*, 522 F.3d 343, 348 (4th Cir. 2008) (citing *Gonzales v. Duenas-Alvarez*, 549 U.S. 183 (2007)).[6] A federal court is bound by the state supreme court's interpretation of its law. *Johnson* 559 U.S. at 138.

---

[6] "We rely on precedents evaluating whether an offense constitutes a 'crime of violence' under the [United States Sentencing Commission] Guidelines interchangeably with precedents evaluating whether an offense constitutes a 'violent felony' under the ACCA, because the two terms have been defined in a manner that is 'substantively identical.'" *United States v. King*, 673 F.3d 274, 279 n.3 (4th Cir. 2012) (quoting *United States v. Jarmon*, 596 F.3d 228, 231 n.* (4th Cir. 2010)).

Because an individual must commit CDV to commit CDVHAN and because aggravating factors cannot serve to mitigate a CDV offense, if the minimum conduct under which a person can be penalized under the CDV statute constitutes a crime of violence, we can most certainly find that CDVHAN constitutes a violent felony under the ACCA. *See United States v. Chisolm*, 579 F. App'x 187, 195–196 (4th Cir. 2014) (unpublished opinion). We therefore begin our analysis by deciding whether the "offer . . . to cause physical harm or injury to a person's own household member with apparent present ability under circumstances reasonably creating fear of imminent peril," the minimum conduct for which an individual could be found guilty under the CDV statute, falls under the force clause. S.C. Code Ann. § 16–25–20(A) (2011).

There is limited guidance as to what "offer" means in the context of South Carolina criminal domestic violence law, but we find that it, at minimum, means a threat. Black's Law Dictionary defines a threat as simply "a declaration, express or implied, of an intent to inflict loss or pain on another," without any indication that the individual doing the threatening has the ability to inflict such loss or pain. *See* Threat, Black's Law Dictionary (10th ed. 2014) (second definition). The language of the CDV statute clearly requires more than mere words--it requires an expression of intention to cause physical injury coupled with the "apparent present ability" to do so. S.C. Code Ann. § 16–25–20(A) (2011). Additionally, South Carolina case law regarding assault provides further support for the conclusion that one accomplishes an "offer" by more than mere words. The South Carolina Supreme Court has acknowledged that "[t]he crime of assault has long been defined as an unlawful attempt or *offer* to commit a violent injury upon the

21

person of another, *coupled with* a present ability to complete the attempt or offer by a battery." *In re McGee*, 278 S.C. 506, 507–08 (1983) (emphasis added). Therefore, under South Carolina law, an "offer . . . to cause physical harm or injury to a person's own household member with apparent present ability under circumstances reasonably creating fear of imminent peril," S.C. Code Ann. § 16–25–20(A) (2011), can clearly be interpreted as "threatened use of physical force," 18 U.S.C. § 924(e)(2)(B)(i).

Our holding here is also consistent with our opinion in *Chisolm*, in which we held that it was "evident that a conviction for CDV requires the type of violence set forth in the force clause" and therefore CDVHAN was also categorically a crime of violence. 579 F. App'x at 195.[7] Although *Chisolm* does not bind us, we find no reason to depart from its reasoning.

Lewis cites several South Carolina assault and assault and battery cases to support his argument that CDVHAN might include minor touching. However, none of them actually involve CDVHAN convictions. Lewis must show to a level of certainty beyond a mere possibility that an individual could be penalized under the criminal domestic

---

[7] Due to an intervening amendment, the aggravating factors in the version of the CDVHAN statute at issue in *Chisolm* are different from those at issue here. However, we are not precluded from reaching the same conclusion in this case. Under the version of the CDVHAN statute at issue in *Chisolm*, an individual was guilty of CDVHAN if the individual committed CDV while also committing assault and battery of a high and aggravated nature. The underlying CDV statute at issue in *Chisolm* is the same as the one at issue here. Notwithstanding the fact that we had previously held that assault and battery of a high and aggravated nature was not categorically a crime of violence, we found in *Chisolm* that because CDV was a crime of violence CDVHAN was also a crime of violence. Because the aggravating language was not at issue in *Chisolm* and because the underlying CDV statute remains constant, we reach the same conclusion here.

violence of a *high and aggravated* nature statute for conduct that falls outside of that which is captured by the force clause. Lewis has not provided, nor have we been able to locate, such a case. Although *State v. Golston*, 732 S.E.2d 175 (S.C. Ct. App. 2012), which Lewis cites, does involve a CDVHAN conviction, there the defendant beat the victim to a point where her face was so swollen that her own son testified that he did not recognize her. *Id.* at 177. This clearly involved force capable of causing physical injury and not minor touching.

We accordingly affirm the district court's sentence.

## III.

Because we conclude that the district court did not err in denying Lewis's motion to suppress, the district court did not abuse its discretion in denying Lewis a mistrial, and CDVHAN is a violent felony for ACCA purposes, Lewis's conviction and sentence are

*AFFIRMED*.

23

THACKER, Circuit Judge, dissenting:

"Positive identification testimony is the most dangerous evidence known to the law." *Smith v. Paderick*, 519 F.2d 70, 75 (4th Cir. 1975).   In this case, two eyewitnesses who claim to have seen Jamal Lewis holding a gun were shown a photograph of Lewis (and *only* Lewis) directly before identifying him in person.  Moreover, an officer asked one of them, after she viewed the photograph, "If I were to walk him outside of that door right there, would you recognize him . . . ?"  And then, right on cue, officers walked Lewis -- and Lewis alone -- outside the aforementioned door.

"[E]ager to be of assistance, a potential witness may be readily receptive to subtle, even circumstantial, insinuation that the person viewed is the culprit."  *Paderick*, 519 F.2d at 75.  More than a "subtle . . . insinuation," the unnecessarily suggestive procedure employed here, and the unreliable identifications that followed, constitute a blatant violation of Lewis's due process rights.  Thus, I believe the district court's denial of Lewis's motion to suppress was both factually and legally erroneous.  Because the Government has not demonstrated beyond a reasonable doubt that this error did not contribute to the verdict, I would vacate Lewis's conviction and sentence and remand for a new trial without benefit of the dubious identifications.  I respectfully dissent.

I.

In assessing the constitutionality of pretrial identifications, "every case must be resolved on its own unique facts."  *Stanley v. Cox*, 486 F.2d 48, 52 (4th Cir. 1973).  Therefore, it is important to recount the unique facts here.

24

At approximately 8:00 p.m. on March 30, 2015, Kelly Shuler was outside of her apartment when she saw someone raise a weapon, fire a shot, and then turn the gun back toward her. She went inside her apartment and told her partner, Christopher Alexander, what had happened. He then came back outside with her. At that point, an individual "was coming back from the woods toward[] [the] apartment." J.A. 89.[1] Alexander observed that individual attempting to clear a jam in his gun. The individual then passed a van next to which Shuler and Alexander were standing, and he briefly stopped before proceeding to the door of Apartment 6.

Alexander called 911. Law enforcement responded approximately six minutes later. It is undisputed that, during the time between the 911 call and the arrival of law enforcement, neither the front nor back doors of Apartment 6 were secured. Once they arrived, officers then secured the scene and viewed a surveillance video from a nearby apartment, which revealed two African American men in a dispute, one shooting toward another, and the shooter going into Apartment 6.[2] Detective William Kitelinger contacted the tenant in Apartment 6, Venus Saintonge, by telephone in an attempt to gain entry into the apartment. Saintonge told him she was not home and was at work.

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

[2] Of note, officers did not retain a copy of this surveillance video for use at the suppression hearing or trial. So we do not have the benefit of a potentially untainted eyewitness -- the video.

Officers also talked to Shuler and Alexander. Based on the video and Shuler's and Alexander's statements, officers obtained a search warrant for Apartment 6. The search warrant was executed around 11:30 p.m. Lewis was located in an upstairs bedroom of Apartment 6 with Saintonge, along with a .45 caliber handgun and ammunition, which matched an unfired cartridge recovered from the parking lot. Lewis was not holding or touching the gun. Drugs were also found in the apartment, for which Saintonge was later charged. Saintonge, caught in the apartment when she had already told Detective Kitelinger she was at work, falsely told the officers that Kitelinger must have spoken with her roommate on the phone earlier, and not her.

Approximately four hours after the shooting incident, the officers alternately placed Shuler and Alexander in the back of a police car for a showup identification procedure[3] in the apartment complex parking lot. The camera in the police car recorded each individual procedure, and CDs of the same were played at the suppression hearing and at trial.

Detective Kitelinger took charge of the identification procedure. He showed Shuler two photographs of Lewis.[4] After seeing the first photograph, Shuler said, "That

---

[3] A showup identification is traditionally known as an out of court, "one-man confrontation[]" or "one-on-one . . . identification[]" where a witness views only one suspect and tells law enforcement whether that person is the perpetrator. *United States v. Porter*, 338 F. App'x 300, 305 (4th Cir. 2009) (per curiam); *Stanley v. Cox*, 486 F.2d 48, 50 (4th Cir. 1973). The procedure "has been widely condemned" but not declared per se unconstitutional. *Stovall v. Denno*, 388 U.S. 293, 302 (1967).

[4] The photographs are also not in the record. At trial, Detective Kitelinger testified, "I took a picture of [Lewis] that we had on file and put it on my phone, and (Continued)

looks very similar. . . . He's normally in jeans and a long white shirt, but he looks very similar." CD Ex. 1 at 1:57–59; 2:07–12.[5] When asked if the man in the picture was the "guy that you saw running past you," Shuler said, "I believe so." *Id*. at 2:14–15. After seeing the second picture of Lewis, Shuler said, "I would say so. I don't remember the neck tattoo, but I didn't get a good look at his neck. . . . He normally has more facial hair than is in that picture." *Id*. at 2:46–3:02. Then Detective Kitelinger asked, "If I were to walk him outside of that door right there, would you recognize him . . . ?" *Id*. at 4:12–17. Shuler responded that Alexander would be better at identifications because "I kind of freak out and shut down when stuff happens." *Id*. at 4:18–27. Detective Kitelinger then told her, "The thing I want you to remember is that [the shooting victim] could have been your child," and it was "important for everybody" that she "hold it together." *Id*. at 4:27–35. He then told Shuler, "I'm going to have the officers walk him out [and] stand right in that door over there . . . ." *Id*. at 4:36–41.

Officers then brought Lewis out into a doorway, which was dark. Shuler said, "I can't see anything from back here," and officers shined a light on Lewis. CD Ex. 1, 5:58–6:00. Shuler then identified Lewis as the shooter, saying, "That's him." *Id*. at 6:02–10. Shuler's identification occurred at approximately 11:57 p.m.

_____

showed the witnesses . . . ." J.A. 328. He did not mention where he obtained the second photograph, nor did he mention what happened to the photographs he showed the witnesses.

[5] At the suppression hearing, Shuler testified that she was familiar with Lewis, as she had seen him several times at and around Apartment 6 before the shooting incident.

Detective Kitelinger next focused his attention on Alexander. Like Shuler, Alexander was placed in the back of the police car and shown at least one photograph of Lewis and no one else. Alexander said, "That looks like him, yes." CD Ex. 2 at 0:50. Forty seconds later, officers brought Lewis to the same dark doorway, and before Lewis stepped into the light, Alexander said, "Tell you straight up right now, that's him." *Id.* at 1:30. When the light was again shined on Lewis, Alexander again said, "Yes, that's him." *Id.* at 1:42. Alexander's identification occurred at approximately 12:01 a.m.

At the suppression hearing on March 29, 2016, Shuler testified that the shooter was wearing "dark outer clothing with a lighter undershirt." J.A. 93. Shuler was unable to make an in court identification but maintained that her previous out of court identification of Lewis was accurate. Alexander testified that the person he saw with the gun was wearing "[d]ark clothing [and] white pants." *Id.* at 117. Alexander did not specifically recall whether the individual was wearing a baseball hat, but believes he told the 911 operator that he was wearing a hat for a Los Angeles team. Alexander, however, made a positive in court identification of Lewis as the individual who passed him in the parking lot with a gun.

At trial, which began May 2, 2016, the videos of Shuler's and Alexander's identifications in the apartment parking lot were played for the jury, and Alexander again identified Lewis in the courtroom. Saintonge testified that her roommate was dating Lewis and that Lewis would sometimes come by to see the roommate. She also testified that Lewis came to the door of Apartment 6 holding a gun on the night in question. The jury convicted Lewis of being a felon in possession of a firearm.

28

## II.

The Due Process Clause "protects individuals from unreliable identifications that result from impermissibly suggestive procedures," and as such, "[t]he Supreme Court has established a two-step process to determine whether identification testimony is admissible." *United States v. Greene*, 704 F.3d 298, 305–06 (4th Cir. 2013) (citing *Manson v. Brathwaite*, 432 U.S. 98, 110 (1977)). First, "the court must consider whether the identification procedure is unnecessarily suggestive." *Id.* at 305 (internal quotation marks omitted). Second, "if the procedure was unnecessarily suggestive, a court must look at several factors to determine if the identification testimony is nevertheless reliable under the totality of the circumstances." *Id.* (internal quotation marks omitted). In assessing the district court's suppression decision, we review any factual findings made by the district court for clear error, but we review legal issues de novo. *See United States v. Giddins*, 858 F.3d 870, 878–79 (4th Cir. 2017).

### A.

### *Unnecessarily Suggestive*

### 1.

The district court, like the majority, "assume[d] for purposes of th[e] motion [to suppress] that the photographs shown to Ms. Shuler rendered the 'show-up' identification procedure unnecessarily suggestive." J.A. 150; *see also ante* at 13. With good reason.

"A procedure is unnecessarily suggestive if a positive identification is likely to result from factors other than the witness's own recollection of the crime." *Greene*, 704 F.3d at 306 (internal quotation marks omitted). The Supreme Court has "recognized that

29

improper employment of photographs by police may sometimes cause witnesses to err in identifying criminals." *Simmons v. United States*, 390 U.S. 377, 383 (1968). The Court explained,

> A witness may have obtained only a brief glimpse of a criminal, or may have seen him under poor conditions. Even if the police subsequently follow the most correct photographic identification procedures and show him the pictures of a number of individuals without indicating whom they suspect, there is some danger that the witness may make an incorrect identification. This danger will be increased if the police display to the witness *only the picture of a single individual* who generally resembles the person he saw . . . .

*Id.* (emphasis supplied); *see also Brathwaite*, 432 U.S. at 116 ("[I]dentifications arising from single-photograph displays may be viewed in general with suspicion . . . ." (citing *Simmons*, 390 U.S. at 383)). The danger is that "the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identification." *Simmons*, 390 U.S. at 383–84 (footnote omitted). Therefore, showing a witness a photograph of a single person before the witness has a chance to identify a suspect -- which is precisely what happened here -- has been universally regarded as a suggestive practice.

2.

Nearly a decade after *Simmons*, the Supreme Court again addressed single photograph identifications. In *Manson v. Brathwaite*, an undercover police officer, Officer Glover, bought drugs from an individual, and he observed the individual for five to seven minutes at a distance of two feet in a well-lit doorway. 432 U.S. at 100–01. Officer Glover gave his colleagues a description of the individual. *See id.* at 101.

30

Another officer, believing the seller was Nowell Brathwaite based on the description, left a photograph of Brathwaite at the office for Glover. Glover viewed it two days later and identified the person in the photo, Brathwaite, as the person who sold him drugs. *See id.* The photograph was entered into evidence, and Glover also made an in court identification eight months later. *See id.* at 102.

In deciding whether the identification violated due process, the Supreme Court explained, "[A] witness' recollection of the stranger can be distorted easily by the circumstances or by later actions of the police." *Brathwaite,* 432 U.S. at 112. Nonetheless, in that case, the Court upheld the constitutionality of the identification because no officers were present when Glover viewed the photo; there was "little urgency"; he could "view the photograph at his leisure"; and "there was no coercive pressure to make an identification." *Id*. at 116.

On the flip side, this court found a six-photo array shown to a witness to be impermissibly suggestive in a bank robbery case. There, the defendant's photo "stood out sharply from the others in the array" because it was the only one with a certain color of background and lighting that made the defendant look "menacing," and police "fail[ed] . . . to take precautions that would have reduced the risk of a tainted identification." *United States v. Saunders*, 501 F.3d 384, 390–91 (4th Cir. 2007). The police also told the witness on the way to the station that they had arrested a suspect in the robbery. The court explained, "The witness . . . can feel pressure to make an identification, even if he is not fully confident, for fear of jeopardizing the case against the arrested suspect." *Id*. at 391; *see also Simmons*, 390 U.S. at 383 (stating that the

31

"chance of misidentification is . . . heightened if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime").

3.

The facts of this case are more violative than *Saunders* and distinguishable from *Brathwaite*. Both Shuler and Alexander were sitting captive in the back of a police car and knew that the police had a suspect in custody. Then, Detective Kitelinger showed the witnesses photographs of Lewis *only*, without even an attempt at an array. He thereafter asked Shuler, "If I were to walk him outside of that door right there, would you recognize him?" And, significantly, Detective Kitelinger brought more pressure to bear when he told Shuler it was "important for everyone" that she "hold it together" and that the victim "could have been your child," directly before shining a spotlight on Lewis. This "coercive pressure to make an identification" is precisely that which the Supreme Court warned against in *Brathwaite*, *see* 432 U.S. at 116, and renders the entire identification procedure suggestive. This single photograph display was also *unnecessarily* so, particularly since officers brought the suspect out in person only seconds later.

B.

*Reliability*

The district court denied Lewis's motion to suppress because, although the procedure may have been unnecessarily suggestive, the identifications were "nevertheless reliable under the totality of the circumstances" pursuant to a five factor test set forth in *Neil v. Biggers*, 409 U.S. 188 (1972). *Greene*, 704 F.3d at 305 (internal quotation marks omitted). The district court not only clearly erred in finding that certain factors weighed

32

in favor of reliability, but it also erred legally by failing to "weigh[] the corrupting effect of the suggestive" single photograph display, which took place mere seconds or minutes before the witnesses' identifications, against the *Biggers* factors. *Brathwaite*, 432 U.S. at 114; *see also Garvey v. Duncan*, 485 F.3d 709, 727–28 (2d Cir. 2007) (Straub, J., dissenting).

> Under *Biggers*, we consider:
>
>> (1) the witness's opportunity to view the suspect at the time of the crime; (2) the witness's degree of attention at the time; (3) the accuracy of the witness's initial description of the suspect; (4) the witness's level of certainty in making the identification; and (5) the length of time between the crime and the identification.

*Saunders*, 501 F.3d at 391 (citing *Biggers*, 409 U.S. at 199–200). But importantly, "reliability is the linchpin in determining the admissibility of identification testimony [and] [a]gainst the[] [*Biggers*] factors is to be weighed the corrupting effect of the suggestive identification itself." *Brathwaite*, 432 U.S. at 114. Put another way, the test is not based on which side garners the most factors in its favor. *See United States v. Field*, 625 F.2d 862, 870 (9th Cir. 1980) (ticking through each factor and then weighing them as a whole against the effect of the suggestive procedure); *United States v. Concepcion*, 983 F.2d 369, 377 (2d Cir. 1992) ("A good or poor rating with respect to any one of these factors will generally not be dispositive."); *cf. Dickerson v. Fogg*, 692 F.2d 238, 248 n.3 (2d Cir. 1982) (Newman, J., concurring) ("Implicit in the *Brathwaite* approach of balancing factors . . . is that lesser degrees of suggestiveness may indicate that the balance in many cases will favor admissibility of the identification testimony. . . ."). On

33

the whole, due process requires the exclusion of an eyewitness identification obtained through procedures that "made it all but inevitable that [the witness] would identify [the defendant]." *Foster v. California*, 394 U.S. 440, 443 (1969).

1.

*Witness Shuler*

a.

*Opportunity to View the Suspect*

On the first factor -- the opportunity to view the suspect -- courts have found the following considerations relevant: lighting, distance, eye contact, duration of the view, angle of the view, and whether there were any obstructions. *See, e.g.*, *Fowler v. Joyner*, 753 F.3d 446, 458 (4th Cir. 2014) (on habeas review, indicating first factor weighed in favor of reliability where witness "was able to and did observe [the suspect's] facial features from different angles" in "fluorescent lighting" from 25 feet away); *Saunders*, 501 F.3d at 392 (same, where cashier made eye contact with liquor store robbery suspect, who was a few feet away, for "about three to four seconds, maybe a little longer" and later, "had a clear view of the side of [his] face" (internal quotation marks omitted)); *see also United States v. Rattler*, 475 F.3d 408, 414 (D.C. Cir. 2007) (same, where "each of the bank tellers directly confronted by the robber gave him her focused attention for a period of minutes under good lighting conditions"); *Gregory-Bey v. Hanks*, 332 F.3d 1036, 1050 (7th Cir. 2003) (same, where witnesses had "ample time and opportunity to view [the suspect's] face and bodily features over the course of several minutes and from multiple angles during the course of robbery" and where "[n]either of the robbers wore

34

masks and the store was well lit"); *Clark v. Caspari*, 274 F.3d 507, 512 (8th Cir. 2001) (same, where witness "viewed the[] [suspects] face-to-face when they asked for her help in finding wine, and also, when they were at the cash register").

Courts have also found the first factor in favor of the defendant where witnesses had a quick look -- or no view at all -- of the suspect's face. *See United States v. Eltayib*, 88 F.3d 157, 167 (2d Cir. 1996) (defendant prevailed on first factor where witness "was in position to see the man in question on a[] moving ship at a distance of 35 to 40 feet for fifteen (or perhaps only a few) minutes," but witness "did not look directly at the man's face for more than a few moments"); *Concepcion*, 983 F.2d at 379 ("Though [the witness] had been just four or five feet away from the killer and characterized his opportunity to observe as good, he implied that at least some of the killer's face was covered . . . and he testified that he had 'just a quick look' at the shooter, as the entire incident took only 5–7 seconds.").

Here, Shuler saw the suspect in the parking lot from a "fairly large distance" the first time around. J.A. 150. Shuler then went inside and returned with Alexander, and then the suspect came "within a few feet" of her as she stood beside her van. *Id.* The record reflects the shooter was "walking quickly," *id*. at 111; may have stopped briefly, but not for any discernable amount of time; and the suspect was " racking his gun to eject a cartridge or clear a jam," suggesting he was looking at the gun at some point, *id*. at 144; *see also id.* at 26 (Government explaining the suspect "appeared to be trying to unload the weapon"). We do not have any indication Shuler was able to see the suspect's face. Indeed, Shuler admitted on cross examination that she "did not get a good look at the

35

[suspect's] face" the first time when he was "[i]n the street," and when asked whether she got a good look the second time, she responded only, "He walked back past me," and did not report further details. *Id*. at 112. Additionally, the sun had already set at the time of the 8:00 p.m. shooting;[6] Shuler testified it was "getting dark" when she went outside to smoke, *id*. at 99; and Officer Steven Riebesell, the first officer to arrive on the scene at 8:12 p.m., testified that "it was dark out," *id*. at 40. Moreover, there is no testimony demonstrating that artificial light made the suspect easier to see.

In the face of this evidence, the district court considered only one of the circumstances mentioned above -- the distance between Shuler and the suspect. *See* J.A. 150. Considering the facts as a whole -- the sun had set, Shuler provided no details about the shooter's face and did not say she saw his face, the shooter was moving quickly the whole time except for a brief stop -- the district court's finding that the first factor weighs in favor of reliability was clearly erroneous.

---

[6] Sunset was 7:34 p.m. on March 30, 2015, in Myrtle Beach. *See* U.S. Naval Observatory, Astronomical Applications Dep't, http://aa.usno.navy.mil/rstt/onedaytable?ID=AA&year=2015&month=3&day=30&state= SC&place=Myrtle+Beach (attached as PDF document). We can take judicial notice of this fact. "'The kinds of things about which courts ordinarily take judicial notice' include 'scientific facts: for instance, when does the sun rise or set.'" *United States v. Thompson*, 591 F. App'x 652, 655 n.2 (10th Cir. 2014) (quoting *Shahar v. Bowers*, 120 F.3d 211, 214 (11th Cir. 1997)) (alterations omitted); *see also* Fed. R. Evid. 201(d).

b.

*Degree of Attention at the Time*

As to the second factor, there is no evidence that Shuler's degree of attention was affected at the time she saw the suspect. She was smoking (or planning to smoke) a cigarette the first time, but there is no indication she was doing anything distracting. And she was looking specifically for the suspect the second time she saw him. *See Howard v. Bouchard*, 405 F.3d 459, 473 (6th Cir. 2005) ("[T]he witness has a reason to pay attention to the perpetrator" when a crime is underway). Thus, the district court was correct that this factor weighs in favor of reliability.

c.

*Accuracy of the Initial Description*

On the third factor, we look to the accuracy of the witness's initial description of the suspect. In *Fowler*, we found this factor in favor of the Government where the witness provided details of the suspect as a "black [man], in his late twenties, and approximately six feet tall [with] a pointed nose and hair on his face but not a full beard [and] wearing a green toboggan and a camouflage army jacket." *Fowler*, 753 F.3d at 451. But here, Shuler's description of the suspect left much to be desired. It was simply "a black male, small to medium build, wearing a dark shirt or jacket (dark upper body clothing) and jeans." J.A. 145. This could describe any number of people. *See Raheem v. Kelly*, 257 F.3d 122, 138 (2d Cir. 2001) ("[T]he descriptions of the shooter given by [the witnesses] [do not] instill any confidence as to the reliability of their identifications . . . for though they provided general information as to the shooter's age, height, and

37

weight, they provided virtually no detail about his face."). Moreover, "when the interaction is brief, the presence of a visible weapon can affect the reliability of an identification and the accuracy of a witness' description of the perpetrator." *State v. Henderson*, 27 A.3d 872, 905 (N.J. 2011) (discussing Nancy M. Steblay, *A Meta– Analytic Review of the Weapon Focus Effect*, 16 Law & Hum. Behav. 413 (1992)). Therefore, the fact that Lewis generally fit Shuler's generic description cannot bear the weight the district court gave it. As a result, this factor should not weigh in favor of reliability.

d.

*Level of Certainty in Making the Identification*

With regard to the fourth factor, we look to "the witness's level of certainty in making the identification." First, Shuler admitted to the officers she "kind of freak[s] out and shut[s] down when stuff happens." CD Ex. 1 at 4:18–27. Moreover, any degree of certainty Shuler may have had in her identification is weakened by the showing of a photograph approximately three minutes before her identification. *See Caspari*, 274 F.3d at 511 ("[N]either [of the witnesses] were able to provide a detailed description to the police prior to the apprehension of [defendants]. This makes it impossible to assess the reliability of their identifications based on the accuracy of any prior descriptions, and leaves open the possibility that their later descriptions were tainted by" a suggestive identification procedure). We must also take into account the question, "If I were to walk *him* outside of that door right there, would you recognize *him* . . . ?" *Id*. at 4:12–17 (emphasis supplied). It is common sense that if the suspect matches the pictures a

38

witness has just been shown, the witness is going to be more certain in her identification, especially when the procedure is punctuated by officers shining a bright light on the suspect. *See Eltayib*, 88 F.3d at 167 ("There is no indication that [the witness] expressed uncertainty during his photo array identification . . . , but that would seem to cut the other way given the suggestive nature of the array."); *cf. United States v. Maldonado-Rivera*, 922 F.2d 934, 975–76 (2d Cir. 1990) (prosecutor "may not properly engage in procedures that are designed to . . . turn a tentative identification into one that is certain").

It is equally troubling that Shuler expressed hesitation when she was first shown the photographs of Lewis: the photos looked "very similar" to the suspect, and she "believe[d]" it was him, but she didn't remember a neck tattoo, and he "normally has more facial hair." Her level of certainty at that moment was not high. And significantly, Shuler could not make an in court identification of Lewis, face to face with him at the suppression hearing. The district court erred in failing to consider these circumstances, especially the photographs of Lewis, and in finding that the fourth factor weighs in favor of reliability. It does not.

e.

*Length of Time Between Crime and Identification*

Finally, we look to the length of time between the crime and the identification. Shuler's identification occurred within four hours after she first saw the suspect. We have held that where an identification is made "only two hours after the [crime] occurred," the witness's "recollection of the crime was still fresh." *Saunders*, 501 F.3d at 392; *see also id.* (citing with approval *United States v. Evans*, 484 F.2d 1178, 1185 (2d

39

Cir. 1973), where photo identification made "several hours" after the robbery occurred indicated that the identification was reliable).  Our sister circuits have held that a period of days or months can still weigh in favor of reliability.  *See, e.g.*, *Howard*, 405 F.3d at 473 ("Three months is not a great length of time between an observation and identification."); *United States v. Gatewood*, 230 F.3d 186, 193 (6th Cir. 2000) (en banc) (identification reliable where witnesses "identified [the suspect] only four days later"); *Hagen v. Sumner*, 1988 WL 131652, at *1 (9th Cir. Nov. 29, 1988) ("[T]he length of time between the crime and the identification was short -- only two days.").  *But see Biggers*, 409 U.S. at 201 (lapse of seven months between the crime and the identification "would be a seriously negative factor in most cases");[7] *Greene*, 704 F.3d at 309 (17 months too long to be reliable).

Technically, this factor should weigh in favor of reliability.  However, studies have shown that "[s]how-ups occurring only two hours after the encounter frequently led to misidentifications."  *Greene*, 704 F.3d at 307 (citing *Henderson*, 27 A.3d at 903 (citing A.D. Yarmey et al., *Accuracy of Eyewitness Identifications in Showups and Lineups*, 20 Law & Human Behavior 459, 464 (1996))).  And this is especially so where the time period is interrupted with an unnecessarily suggestive presentation of a

---

[7] I disagree with the majority's reliance on the *Biggers* case itself on this factor. *See ante* at 15.  The "unique circumstance[]" presented in *Biggers* -- the witness's "record for reliability was . . . a good one, as she had previously resisted whatever suggestiveness inheres in a showup."  409 U.S. at 201 -- is simply not present here.  And *Biggers* by no means held that any time an identification is given seven months after an incident, it is sufficiently reliable.

photograph of the defendant; in my view, this eradicates any reliability otherwise stemming from a short temporal break. *See United States v. Bagley*, 772 F.2d 482, 493 (9th Cir. 1985) ("Photographic procedures which emphasize the focus upon a single individual increase the danger of misidentification."). As a result, in light of the showing of Lewis's photographs, the relatively short time gap does not make Shuler's identification any more reliable.

Considering the totality of the circumstances, the suggestive showing of Lewis's photographs to Shuler in the police car -- weighed against the *Biggers* factors -- render her out of court identification unreliable.

2.

*Witness Alexander*

a.

*Opportunity to View the Suspect*

As to Alexander, on the first *Biggers* factor, he testified that he saw the individual first from a distance of 25 yards, pointing a gun toward Shuler, and then he came within "24 to 36 inches" from him before stopping briefly and running or walking quickly away. J.A. 116. Alexander also testified that the suspect was running from the woods and trying to clear a jam out of a gun. He recognized the type of gun the suspect was carrying as a black .45 caliber pistol. He also testified that he "looked him right square in the face." *Id.* at 123. The record demonstrates that Alexander had a better opportunity to see the suspect than Shuler, and despite the suspect's swift movements and the impending darkness, this factor weighs in favor of reliability.

41

b.

*Degree of Attention at the Time*

On the second factor, as with Shuler, there is no evidence that Alexander's degree of attention was affected at the time he saw the suspect. Rather, he was paying close attention. Therefore, this factor also weighs in favor of reliability.

c.

*Accuracy of the Initial Description*

On the third factor, again like Shuler, the accuracy of Alexander's initial description of the suspect was quite generic and at one point even inconsistent. Alexander "did not specifically recall whether the individual was wearing a baseball hat but believes he told the 911 operator that the suspect was wearing a baseball hat for a Los Angeles team." J.A. 144. No such hat was recovered from the scene, and Lewis was not wearing a hat when Alexander identified him. Also, Alexander's initial description of the suspect to the police was that he was wearing "dark clothing, dark shirt or jeans," *id.* at 48, but at the suppression hearing and trial, he said the individual was wearing "white pants." *Id.* at 117, 304. Finally, as mentioned above, when an interaction is brief and the perpetrator has a weapon, a witness is less likely to give an accurate description of the perpetrator. *See Henderson*, 27 A.3d at 905. Indeed, despite the brief interaction here, Alexander was paying close attention to the weapon -- telling officers precisely what type of gun the suspect was carrying -- but was unable to provide more than a superficial description of the suspect. The district court erred in finding this factor in favor of reliability.

42

d.

*Level of Certainty in Making the Identification*

Turning to the fourth factor -- the level of certainty in making the identification – Alexander's language was unequivocal. But he also testified that, even surrounded by police with Lewis in custody, he was "nervous" and "worked up," and did not remember telling officers there was someone else out in the woods who might hurt his family. J.A. 317–18.[8] *Cf. Grayer v. McKee*, 149 F. App'x 435, 440 (6th Cir. 2005) (in analyzing *Biggers* factors, explaining the witness "seemingly did not suffer from fear or stress during this incident, as crime victims and witnesses often do."). And of note, the video of Alexander's identification demonstrates that at the moment Alexander first identified Lewis, Lewis was standing in the dark. We must also factor the photograph into our equation. *See United States ex rel. Hudson v. Brierton*, 699 F.2d 917, 925 (7th Cir. 1983) (fourth factor "must be considered in light of the suggestive circumstances"). Alexander was shown the photograph of Lewis, and then 40 seconds later, officers brought Lewis into view. In light of Alexander's state of mind and the unnecessarily suggestive procedure, his certainty does little to support the reliability of his identification.

---

[8] While he was in the back of the police car, Alexander turned to look over his shoulder and said, "There's someone in the back of those woods . . . watching us [who] poses a real threat to my family." CD Ex. 2, at 1:54.

43

e.

*Length of Time Between Crime and Identification*

Finally, the four hour length of time between the shooting and the identification must also be considered in light of the intervening presentation of the photograph. Under the circumstances, this factor weighs against reliability as well.

In sum, Alexander's identification, like Shuler's, was "distorted easily by the circumstances" and unreliable under the totality of the circumstances. *Brathwaite,* 432 U.S. at 112; *cf. id.* at 116 (procedure was upheld where there was "little urgency"; he could "view the photograph at his leisure"; and "there was no coercive pressure to make an identification.").[9]

3.

Considering these factors, the district court factually and legally erred in failing to consider whether the suggestive identification procedure tainted any subsequent identifications by Shuler and Alexander.[10] Indeed, the procedure employed here "made it

---

[9] Alexander also identified Lewis in court at the suppression hearing and trial, but this identification is invalid because there is no indication that the "in-court identification [wa]s founded on matters other than the pre-trial identification." *United States v. Young*, 529 F.2d 193, 195 (4th Cir. 1975) (per curiam); *see also Saunders*, 501 F.3d at 390 ("[T]he witness 'is apt to retain in his memory the image of the photograph rather than the person actually seen, reducing the trustworthiness of subsequent courtroom identification'" (alteration omitted) (quoting *Simmons*, 390 U.S. at 383–84)); *Young v. Conway*, 698 F.3d 69, 78 (2d Cir. 2012); *United States v. Love*, 746 F.2d 477, 478 (9th Cir. 1984) (per curiam).

[10] Although the majority acknowledges that the *Biggers* factors must be "weighed against the corrupting effect of the suggestive identification," *ante* at 12 (internal quotation marks omitted), it nonetheless fails to address the legal error inherent in the (Continued)

44

all but inevitable that [Shuler and Alexander] would identify [Lewis]." *Foster*, 394 U.S. at 443. Detective Kitelinger testified that showing a photograph prior to a showup identification procedure is "something that is normally done" "[i]n some cases" in his department. J.A. 328. If so, that is a problem, and this practice must stop. Because "[a] primary aim of excluding identification evidence obtained under unnecessarily suggestive circumstances . . . is to deter law enforcement use of improper . . . showups," *Perry v. New Hampshire*, 565 U.S. 228, 241 (2012)), the motion to suppress should have been granted.

## III.

I now consider whether "the government can show beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained," and if it can make that showing, "then the error is deemed harmless and the defendant is not entitled to reversal." *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1907 (2017) (internal quotation marks omitted); *see also Fowler v. Joyner*, 753 F.3d 446, 459 (4th Cir. 2014). The inquiry "is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993) (emphasis in

---

district court's failure to weigh the showing of Lewis's photograph(s) against those factors. Instead, despite our precedent to the contrary, it subjects the entire decision to a clearly erroneous standard of review. *See United States v. Giddins*, 858 F.3d 870, 878–79 (4th Cir. 2017) (explaining that in reviewing a suppression decision, we review legal issues de novo).

original).  In fact, "[w]here there is uncertainty as to the effect on the verdict . . . the court must treat the error as having affected the verdict." *United States v. Cunningham*, 145 F.3d 1385, 1394 (D.C. Cir. 1998) (citing *O'Neal v. McAninch*, 513 U.S. 432, 435–36 (1995)).

First, as stated above, Shuler's and Alexander's initial descriptions of the shooter were unremarkable and inconsistent: a black man with a gun in dark clothing, jeans *or* white pants, and *possibly* a hat for a Los Angeles team of some type, which was never recovered from the scene.  They also told police that a black man discharged a cartridge and ran into Apartment 6.  Moreover, Alexander mentioned that someone was still in the woods behind the apartment complex.  The Government claims "[t]he police secured the entrance to Apartment Six until they obtained a search warrant," Gov't's Br. 23, but it cannot account for the time between when the suspect entered Apartment 6 and the police arrived, which was around six minutes later.  *See* J.A. 145 ("Law enforcement received the [911] call at approximately 8:06 p.m. and arrived on the scene at approximately 8:12 p.m.").  Both Saintonge and Officer Riebesell testified that the apartment had a back door, and Officer Riebesell testified that he did not know if anyone went out the back door before he arrived.

Second, the officers testified about the crime scene, explaining that Lewis was found face down on the floor of the bedroom, and the gun was found on the bed.  Significantly, no officer testified that Lewis was touching the gun, no officer observed Lewis in person before they found him in the bedroom, and no officer testified that the person they saw on the apartment complex video was actually Lewis.  Moreover, Officer

46

David Bailey admitted he did not test the gun for fingerprints, did not collect any DNA from the clothing or gun, and did not remember if he took any clothing found in the bedroom into evidence.

Third, Saintonge testified. Although her testimony placed Lewis at the door of Apartment 6 with a gun, she admitted that, on the night of Lewis's arrest, she told officers that somebody other than Lewis "had come in and gone through the apartment" while she was upstairs. J.A. 239. Significantly, she did not tell police on the night in question that Lewis had a gun, and she made no written statement that Lewis had a gun in her apartment until April 28, 2016, the eve of jury selection. Moreover, Saintonge admitted she lied to Detective Kitelinger, and she admitted she lied to other officers when she told them Detective Kitelinger talked to her roommate on the phone, and not her. She admitted she was charged with being an accessory after the fact, and that she was being charged in state court in connection with drugs found in her apartment that night. Thus, a jury would have ample reason to view Saintonge's testimony with skepticism.

Based on this evidence, in my view, the Government has not met its burden in demonstrating *beyond a reasonable doubt* that the admission of Shuler's and Alexander's identifications did not contribute to the verdict. The evidence presented demonstrated only that Lewis was in the same room with the gun, and that a cartridge discharged outside matched the ammunition for that gun. Shuler and Alexander gave a *generic* description of *someone* with a gun running into Apartment 6. The identification testimony of Shuler and Alexander was crucial to establishing that the man who ran into Apartment 6 was the same man who came out of Apartment 6 with the officers. No other

47

witnesses' testimony, besides Saintonge's, could establish that link, and a reasonable jury could have easily disregarded Saintonge's questionable testimony. And, critically, officers did not retain the purported apartment complex video of the crime.

In sum, I do not believe the error here was harmless. Therefore, I would vacate the entire judgment and remand.